### Fusz v. Spaunhorst *et al.*, *Appellants.*

1. **Liability of Bank Officer to Depositor at Common Law.** Aside from statutory or constitutional provisions, a director or officer of an incorporated bank is not individually responsible in an action at law for injury resulting to a creditor or depositor from the management of the bank, unless the injury is occasioned by his malicious or fraudulent act.

2. ——— **under the Constitution of 1875.** Section 27, Art. 12, constitution of 1875, which declares that "it shall be a crime, the nature and punishment of which shall be prescribed by law, for any president, director, manager, cashier or other officer of any banking institution, to assent to the reception of deposits, or the creation of debts by such banking institution, after he shall have had knowledge of the fact that it is insolvent, or in failing circumstances; and any such officer, agent or manager shall be individually responsible for such deposits so received, and all such debts so created with his assent." *Held* not to be self-enforcing.

*Appeal from St. Louis Court of Appeals.*

*Glover & Shepley* for appellants.

1. It is not the office of a constitution to engage in any matter of ordinary legislation. Its office is to lay out and establish principles of government and ordain the methods and instrumentalities of administering the laws. Cooley Const. Lim., p. 2; Mo. Constitution 1875, Art. 4, Sec. 1; Jameson Const. Conventions, p. 391. A convention cannot properly declare on what facts a cause of action shall exist, and point out a judgment to be rendered; and the courts will assume *prima facie* that no such thing was intended.

2. The purpose of the section was to enjoin it on the legislature to pass a law or laws showing under what circumstances the receiving of deposits and creating of debts by an insolvent bank should be a crime in its officers; and to punish the crime and to make the officers guilty of it, personally responsible for such deposits and debts.

This, the counsel argued, clearly appeared from the use in the two members of the sentence which compose this section of the words "and," "such" and "so."

3. The adjudicated cases sustain the view of appellants. *Groves v. Slaughter*, 15 Pet. 449; *People v. Supervisors*, 3 Barb. 332; *U. S. v. Bevans*, 3 Wheat. 336; *U. S. v. Hudson*, 7 Cranch 32; *St. Jo. &c. R. R. v. Buchanan Co.*, 39 Mo. 485; *French v. Teschemaker*, 24 Cal. 518.

4. This section regarded as a constitutional direction to the legislature to enact a law or laws with a certain purpose, is practicable and possible. But, if we must regard it as constitutional work, begun and finished by the convention, it is impracticable and impossible. It does not say enough to effect the purpose, nor can it be taken for what it says.

(1.) If we take it literally, it means that one who knew the bank to be insolvent or in failing circumstances may recover for his debt or deposit. It often happens that a bank becomes embarrassed and is like to fail and that its friends are informed of the fact, and knowing it, make deposits on its credit or loan it money to save it; but in such a case the officers would be guarantors, as by the letter of section 27, to such depositors or lenders. Again, suppose certain friends of a bank in the condition just named, knowing all the facts, loan it $100,000 for ten years, and thereby restore its solvency and credit; and suppose no loss occurs from the then existing solvency, but at the end of the ten years the bank is again insolvent, are not the managers responsible personally for the loan?

(2.) Standing alone and without legislation in aid of it, section 27 is crude, indefinite, insufficient, opening a wide door to difficulties which it cannot solve. Whether the knowledge shall be actual or constructive in the officer; whether the officers shall be liable *in solido*, or jointly or severally, or in a certain order, or with or without loss to interested parties; whether the personal liability is to be that of principals or guarantors, or whether it shall be in contract or in tort; and whether one made liable has any recourse on another or on the bank, &c., &c., are matters not touched by the section. Yet, if it is a finished work

by the convention, needing no aid from the legislature, and was so intended; that is, if the section contains all that is necessary for self-execution, the legislature can pass no act in aid of it. The legislature can never amend the constitution by statute; and all the statutes that have been passed upon the subject are simply null and void, and none of the defects of the section can be remedied without a constitutional amendment.

*E. T. Farish* for appellants.

1. We expect to meet, in constitutions, prohibitions, repeal of legislation, the definition of the rights and limits of the different departments of governments, the declaration of rights, and, generally, the assertion of general principles, but seldom, or never, except by way of repeal or prohibition, do constitutions become operative or effective in the way of imposing obligations or duties, or securing rights. Cooley on Const. Lim., 35, 36, 78, 79; The Constitutional Convention, Jameson, p. 83; Jameson on Constitutional Construction, § 429; Conklin's U. S. Courts, p. 138. Again, section 27 is a harsh provision, penal in its nature, and the maxim is that the general words of such enactment shall be restrained for the benefit of him against whom the penalty is inflicted. Dwarris on Stat., 736; Sedg. Cons. Law, 324. Not to observe these rules, in approaching the construction of the provision in question, is to lay aside the canons of construction, is to ignore the rules by which the investigation should be made or the problem solved.

2. Regard being had to the whole subject matter embraced in the constitutional provision under consideration, and the language employed, it is manifest that the same was never meant to be self-enacting, but that legislative action was necessary to enforce its provisions. The mode and manner of such enforcement is not prescribed. It is not declared in what manner the officers shall be re-

sponsible, whether the remedy is by action at law or proceeding in equity; whether the defendants may be sued jointly; whether, in the event of a judgment against them and a payment of the amount, they would have any recourse against the bank, the original debtor; whether any right of contribution exists. There is no idea of subrogation. If the officer is to be responsible, that is, stand as surety, and be made to respond, it certainly can only be in the case and to the extent the principal is in default. If he is to be liable for the whole debt in the first instance, he ought to be subrogated at once to the rights of the depositor, and yet all these difficulties and many others arise; and it would be singular, indeed, if the framers of the constitution intended to leave the solution of these questions, growing out of the enactment, to the courts, without the aid of any positive statute regulating the subject. Nor will the language bear any other interpretation than that this whole matter was referred to the Legislature.

The convention was here dealing with a matter which they proposed should be a crime, and, at the same time, constitute a civil liability, but after all it was but one and the same subject matter, and when they referred the criminal branch of the provision in express terms to the Legislature, they necessarily referred its accompaniment; until the Legislature grades the offense, and affixes the penalty; there is no crime, and as the civil liability is imposed for deposits so received, it refers to the reception of deposits after the crime has been defined.

3. The legislative branch of the government did not understand that the provision was self-enacting; but on the contrary, and accordingly to carry this provision into effect, an act was passed. Acts 1877, p. 35; also Sec. 21, p. 33; also p. 239.

*Henry Hitchcock* for appellants, submitted the following propositions:

I. The inquiry for this court is simply—what was

the true intent of the framers of the constitution, in using the language which they adopted?

II.   A particular construction will not be established merely because it is one which the language will bear, not even though apparently reasonable by itself.   It must also appear, that such construction is the one most natural and probable, due regard being had to all the circumstances, and to the accepted principles of constitutional interpretation.

III.   The following elements are proper to be considered, upon such an inquiry :

1.   That the clause in question is found in a constitution, and not in a statute.   2.   The context of the constitution itself—and whether, in view of that, the construction proposed is the most natural and reasonable one.   3.   The nature of the evil to be remedied or prevented,—and whether, in view thereof, the construction proposed is the most probable and reasonable.   4.   The effect of the construction, as compared (1) with the probable intent of the clause in question, and (2) with a different construction contended for.   5.   The legislative interpretation, if any, of the clause in question.

Under the last four subdivisions, the counsel argued at length:   1.   The construction proposed by respondents is inconsistent with section 1 of the schedule to the constitution which distinctly refers to the General Assembly whenever practicable, the enforcement of its new provisions.   2.   The construction proposed by respondents is not probable or reasonable, because the clause in question is inadequate and incomplete for its supposed purpose.   3. The construction proposed by respondents asserts an intent on the part of the convention which is less reasonable and probable than that contended for by appellants.   4.   Finally, the General Assembly at its first session after November 30th, 1875, construed this clause as requiring further legislation.

*John M. Woodson, B. Gratz Brown* and *McComas &
McKeighan* for respondents.

The provision of the constitution is remedial, and not
penal, in so far as it undertakes to create a civil liability.
It undertakes to prevent fraud, and to create a civil liability
in the interest of the public.   The liability imposed is a
remedy given to the creditor of the bank, not for the pun-
ishment of directors, but for the protection of depositors.
It fixes the liability completely, and needs no legislation.
The Legislature could not do more, so far as the creditor
is concerned, than to re-declare the constitution.   Smith's
Com. on Const., pp. 848, 851; 5 Ben. 219; *Ochiltree v. R.
R.,* 21 Wall. 249; *Citizens Bk. v. Wright,* 6 Ohio St. 318.

There is nothing in the nature of a constitution which
inhibits it from establishing a right and providing a rem-
edy, or from directly or indirectly prohibiting certain acts
and providing the remedy.   In this case the constitution
might have fixed the nature of the crime and its punish-
ment.   What they delegate to the Legislature may be ex-
ercised in the first instance by them in their sovereign
capacity; and they had a right to declare in their consti-
tution what the rights, duties and obligations of corpora-
tions and their officers and directors should be.   *State v.
Cummings,* 36 Mo. 263.

That the Central Savings Bank, its officers, directors
and managers, are subject to legislative control, whether
it be by provision of the organic law or by the terms of a
legislative enactment, we would further cite the court to
the following recent authorities:   *Munn v. Illinois,* 4 Otto
113; *Chicago, Burlington & Quincy R. R. Co. v. Iowa,* 4 Otto
155; *Boyd v. State of Alabama,* 94 U. S. Rep. 645; 4
C. L. J. 553; *Metrop. Board of Excise v. Barrie,* 34 N. Y.
657; *Thorpe v. R. & B. R. R. Co.,* 27 Vt. 143; S. C. 2 Redf.
Am. Rail. Cas., 587.

We claim that section 27, so far as it defines the indi-

vidual responsibility of the officers, directors and managers of a banks assenting to the reception of deposits after they shall have had knowledge of the fact that such bank was insolvent or in failing circumstances, is self-enforcing; that it took effect upon the adoption of the constitution, and thereafter became the rule for the guidance not only of such officers, directors and managers, but became the rigorous law, defining their liability in case of a violation thereof by them. *People v. Rumsey,* 64 Ill. 44; *Hills v. Chicago,* 60 Ill. 86; *People v. McRoberts,* 62 Ill. 38; *Newell v. The People,* 7 N. Y. 97; *Den v. Reid,* 10 Pet. 524; *People v. Purdy,* 2 Hill 35; Cooley's Const. Lim., 55; *Gibbons v. Ogden,* 9 Wheat. 188; *Green v. Robinson,* 5 How. (Miss.) 100; *Brien v. Williamson,* 7 How. (Miss.) 15.

Upon the regard of the legislative body for the mandates of the constitution, and the responsibility of that body to its constituents, the people, it seems, did not see fit wholly to rely, and hence the language of the article making bank officers liable. Something evidently had occurred which led the whole body of the people to denounce the conduct of bank officers; and, to prevent abuses, their responsibility was declared in the body of the constitution.

If there are any other embarrassments growing out of this section, they affect the wrong-doer, and not the depositor, for whose benefit it was adopted. The directors and officers of insolvent and failing banks are informed by this section that it is a crime for them to assent to the reception of deposits, and that they will be individually liable if they do. Here is a wrong, and a consequent liability established in the interest of the person injured. The only thing delegated to the Legislature is the punishment of the offender criminally, in which the State is interested. Is it reasonable to suppose that the convention intended that directors of insolvent banks might go on and defraud depositors until some future Legislature should determine how long the offender should be imprisoned, or what fine

he should pay ? The convention said that the "nature and punishment of the crime should be prescribed by law," but it did not say that the nature and character of the individual liability to the depositor should be prescribed by law. The maxim here applies, "*Expressio unius est exclusio alterius.*"

In reality this provision is self-operative ; that is, it operated upon its adoption as a limitation on the power of the Assembly to authorize counties, cities and towns to become subscribers to the stock of railroad companies. All laws in conflict with the constitution were abrogated or repealed. The court held that the act of February 11th, 1861, which authorized subscription on a vote of a majority of the taxable inhabitants, was repugnant to the constitution. This decision made the section self-operative as a limitation. This is enough for the respondents' position. The distinction between provisions in a constitution which grant or limit the power of legislation upon any subject, and those provisions which are addressed directly to the courts or the people, imposing liabilities or establishing rights, is perfectly obvious and needs no argument for this court.

To us this question is as simple, and at the same time as hard to maintain, as the mathematical truth that twice two are four. He who denies it can sit back complacently and urge objections, while he who would maintain it finds himself in the clear but cold atmosphere of self-evident propositions. The adjective "such," in the latter part of section 27, does not refer to the part of the section "it shall be a crime, the nature and punishment of which shall be prescribed by law," but to that part of the section which immediately follows, denominating the offenders and the constituents of the offense. Another section should be formed, in order that it may visually appear what the convention meant, which would read as follows: "Any officer, agent, manager or other officer of any banking institution, who shall assent to the reception of deposits or the

creation of debts by such banking institution after he shall have had knowledge of the fact that it is insolvent or in failing circumstances, shall be individually responsible for the deposits so received or the debts so created with his assent."

SHERWOOD, C. J.—Aside from statutory provisions or one of similar nature in the organic law, the directors or officers of an incorporated bank would not be individually responsible in an action at law, for injury resulting to a creditor or depositor, unless the injury were occasioned by the malicious or fraudulent act of the party complained of. Mere nonfeasance will not answer; nothing short of active participancy in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the party complaining will give origin to individual liability as above indicated—(*Harman v. Tappenden*, 1 East 555 and cases cited; *Salmon v. Richardson*, 30 Conn. 360; *Gerhard v. Bates*, 20 Eng. Law and Equity 129; *Vose v. Grant*, 15 Mass. 505.) In the case last cited, while it was held that a special action on the case would not lie against a stockholder of an incorporated bank because the stockholders, actuated by no fraudulent purpose and after expiration of their charter, divided the capital stock among themselves, without leaving sufficient corporate funds to redeem their notes and bills, it was broadly intimated that a court of chancery would sustain a bill in behalf of the creditors and against the stockholders, and that this was the appropriate, if not the only remedy to which resort could be had. These remarks are made as indicative of our views of the case before us, so far as concerns the liability of the defendants under the rules of the common law, and as prefatory to the consideration of the precise question presented by this record.

The defendants are respectively sued as the president, directors, cashier and teller of the Central Savings Bank, an incorporated institution, for the amount of deposits

made by plaintiffs while the bank was in an insolvent condition and failing circumstances, the plaintiffs being unaware of such conditions and circumstances at the time of making the deposits, and the defendants fully aware of the condition of the bank, and assenting to the reception of the deposits. A demurrer questioned the sufficiency of the foregoing allegations of the petition.

Reliance for the recovery sought is placed upon the statute in force at the time the deposits were made, and also on section 27, Art. 12, of the present constitution. A very slight inspection of the section of the statute relied on (section 5, chapter 68, page 366, General Statutes, and section 5 Wagner's Statutes, 330), will readily suffice to show that section to have no applicability to the present action. Its requirements are that each corporate savings bank shall semi-annually publish a verified statement of its actual financial condition, and deposit a copy of such statement in the office of Secretary of State, under a penalty of $500, recoverable by *"indictment"* against the president, cashier or directors. From all that appears in the petition this statutory duty was fully discharged in the mode designated by law; and even if default had occurred in this particular, recovery could only be had in the legally prescribed mode.

This being obviously true, it only remains to consider the precise effect to be given to the following section of the constitution: " Section 27. It shall be a crime, the nature and punishment of which shall be prescribed by law, for any president, director, manager, cashier or other officer of any banking institution, to assent to the reception of deposits, or the creation of debts by such banking institution after he shall have had knowledge of the fact that it is insolvent, or in failing circumstances; and any such officer, agent or manager shall be individually responsible for such deposits so received, and all such debts so created with his assent." The cases are exceptional where constitutional provisions enforce themselves; ordinarily

the labors of the convention have to be supplemented by legislation before becoming operative. Of course if it be evident from the terms employed in any particular provision of the organic law, that it shall go into force forthwith, without awaiting ancillary legislation, it will become an imperative judicial duty to thus declare. Such duty, however, will only become manifest when the language employed is free from ambiguity, or when it is apparent either from the language used or from reasonable inference therefrom, or from other sources equally legitimate and accessible where statutory or constitutional construction is involved, that the purpose of the given section will be frustrated, unless immediate effect be accorded to its provisions. That the section in question is not altogether unambiguous is quite apparent from the variant conclusions reached regarding it, by the circuit court and the court of appeals; the latter holding the section, so far as concerns the present action, as presently operative and needing no legislative aid; the former just the contrary. If such diverse conclusions be received as evidence that the words employed are not plainly evincive of an intention that they should, unassisted by legislation, take immediate effect, then we may legitimately resort to other aids than the bare words themselves.

It will be conceded on all hands that the central idea of the section in question is the protection of the creditor and of the depositor. It must further be conceded that if that section be self-enforcing, it will operate in all instances and under all circumstances; operate as an unbending, a *procrustean* rule, regardless of the motive which prompted the deposit, or the intention which actuated the creation of the debt. We are loth to believe this view of the section was entertained by the people when adopting the constitution, because such a construction would oftentimes defeat the very purpose which the section was designed to secure, viz: the protection of the creditor and of the depositor. For it is a matter of common information that

there is a tide in the affairs of banks as well as of men; that financial crises occur when ample assets become for the time being comparatively valueless; when but for timely assistance, institutions of most undoubted and actual solvency, must succumb to the existing pecuniary pressure. It is obvious enough, if assistance be absolutely necessary, even for a brief period, that the bank requiring it cannot justly claim to be entirely solvent at the moment when assistance is asked and afforded. It is equally obvious that if the section relied on by plaintiffs is self-executing, a deposit made with or a loan effected to a bank under the circumstances above noted, though made with full knowledge by the depositor or creditor, and with the express philanthropic purpose of holding up the bank, so as to prevent failure and consequent loss to other depositors or creditors, would subject every officer or director assenting to such loan or deposit, though accepted, or assented to, with the best and purest motives, to individual responsibility. We are altogether unwilling to attribute to those who framed, or to those who by their votes sanctioned and adopted our present constitution, a desire to give such a meaning or place such a construction on the section as would frequently lead to the unjust and inequitable consequences before mentioned. And we have warrant for our refusal in this regard, not only in a familiar canon of construction but in one of the authorities furnished by plaintiffs. In *People ex rel. v. McRoberts*, (62 Ill. 38,) it is said: "The intention of the instrument must prevail; and in its ascertainment we must look at the consequences of a particular construction. If a literal meaning involved a manifest absurdity it should never be adopted." If a literal meaning involving that which is absurd should be rejected, assuredly that meaning should find a like rejection when a different construction would frequently defeat the very end and object of the section demanding construction; and if the section cannot operate in every instance and under

all circumstances, it would seem too clear for argument that it does not enforce itself.

It would be extremely difficult, if not wholly impossible, to say by way of anticipatory definition, what provisions of the organic law would be self-enforcing. Each case must greatly depend upon the language employed and the purpose to be accomplished. We have hitherto borne this in mind when other sections of the constitution have been brought before us for adjudication. Thus, in one instance we held a provision of the constitution self-enforcing which prohibited taxation for school purposes in school districts, from exceeding 40 cents on the $100, (*Board of Public Schools v. Patten*, 62 Mo. 444,) but there the words were plainly unambiguous and positively prohibitory of taxation beyond the designated limit. So also in *ex parte Snyder*, (64 Mo. 58,) we held that certain provisions of the constitution which continued the common pleas courts in existence and abrogated all inconsistent statutes, became immediately operative and needed not legislative aid. And in *State ex rel. v. Holladay*, (64 Mo. 526,) and *State ex rel. v. Holladay*, (66 Mo. 385,) we held that prohibitory provision of the constitution self-enforcing which forbade money from being paid out of the treasury, except in pursuance of an appropriation by law, and that such prohibition of necessity extended to current acts of appropriation, as well as to future acts of that nature. In those cases, however, either from the terms in which the different sections were couched, or from their reason and spirit as well as the evident object in contemplation, we felt no hesitancy in holding that the constitutional provisions then under consideration needed no legislative assistance.

But we regard the present case as widely differing from those in the particulars just mentioned, and for the reasons stated; but those are not the only reasons which may be advanced in support of the position here taken. The provision under discussion is highly penal, and is therefore to receive a more guarded construction than

should otherwise be accorded to it. *Kritzer v. Woodson*, 19 Mo. 327; *Howell v. Stewart*, 54 Mo. 400; Sedgwick on Statutory and Constitutional Law, 281, and cases cited. This would certainly be a correct rule of construction, were a penal statute to be construed, and it would seem that a similar rule of construction is applicable here, where it is to be determined whether a constitutional provision is to be immediately operative, when if so operative, heavy penalties and forfeitures will attend such operation; and although we would not feel at liberty to ignore or disregard the behests of the organic law when couched in language not to be misunderstood, yet when from that language the intent is not entirely clear that the provision was designed to be self-enforcive, we are inclined to act in accordance with the general rules of construction, and regard legislative aid necessary. Nor, in this connection, should it be forgotten that some weight should be given to the action of the Legislature, which, by the passage of the act of April 23rd, 1877, and the other acts referred to in the briefs of counsel, (session acts of that year, pp. 28 and 35,) evidently regarded the provision under consideration as inoperative in the absence of supplementary legislation. (*Groves v. Slaughter*, 15 Pet. 449.)

Again, the section being discussed must, in order to be self-operative be in and of itself *complete*. That it is not complete; that it is in a rudimentary state is evidenced by the words "*individually responsible.*" Responsible to *whom?* To the depositor? To the creditor? To the stockholders or the non-assenting officers or directors? On these points the section is absolutely silent. Now if it be remembered that under the circumstances detailed in the petition, no right of action existed at the common law and no statutory right of action at the time of the adoption of the constitution, it would appear to logically follow that unless the constitution does what we have just seen it does not do, i. e., give in express terms a right of action in favor of a certain class and against a certain class, that no such

right of action exists.   Nor do we see how in this respect the result is changed by that section of the Practice Act (Sec. 1, p. 999, 2 Wag. Stat.), which denominates every action for the enforcement or protection of private rights, and redress or prevention of private wrongs, a civil action; nor by another section of the same act (Sec. 3, p. 1013, 2 Wag. Stat.), which merely prescribes *what* the petition shall contain; and, as a matter of course, presupposes a right of action.   But even granting that the practice act would be sufficiently broad as to the mere institution of the suit, what is to be the nature of the civil liability, primary or secondary, joint or several; and what the form of the judgment?   These are all questions imperiously demanding answers; and yet none can be given, if the section being discussed enforces itself; thus launching upon the sea of litigation a nondescript action unknown to code or common law; deriving neither guiding light from precedent nor assistance from existing enactments.

In conclusion, the protection to be afforded by the provision in question was designed to be accomplished by *two* methods, one *criminal*, the other *civil*; both were in the opinion of the convention necessary, one as much so as the other; both were designed to operate together and harmoniously.   It would have been as easy to have declared the nature and the punishment of the crime of assenting to the reception of deposits, or the creation of debts, as it was to leave it to the Legislature to prescribe; that it was thus left no one disputes.   Can it be possible that the members of the convention were willing to trust the nature and punishment of that act which they denounced as a *crime*, to be defined and provided for by the Legislature, and yet unwilling to trust that general guardian of the peoples' welfare, with the details of the civil liability attached to the commission of that crime, and unwilling also to themselves specify and provide for the details of such civil liability?   In other words, can it be that the convention intended section 27, to operate by *piecemeal*

Fusz v. Spaunhorst.

until such time as the Legislature should otherwise prescribe? We cannot reach such a belief without the greatest difficulty; and it is not easy to resist the impression that both clauses of the section were expressly designed to be of *simultaneous* operation. This we think evinced by the very terms employed. The president, director or other officer is to be punished for *what?* For the crime of assenting to the reception of deposits, or the creation of debts. *When* is he to be punished?—when his punishment is " prescribed by law." What is to be the measure of his civil liability? This and nothing more: he " shall be individually responsible for *such* deposits *so* received and all *such* debts *so* created." Received *how* or created *how?* Obviously only when the act of reception or creation becomes tainted with criminality; has assumed by reason of legislative action, the hue and complexion of a *crime.* In short, we think it very evident that the section whereon the plaintiffs rely, was designed to operate as a *whole* and not in detached portions; that the penalties prescribed, civil and criminal, were to go hand in hand, and that the method of procedure in the criminal phase of the case was no more necessary to be prescribed by law than was the method of procedure whereby the civil liability also incurred, was to be ascertained and determined.

The foregoing considerations induce the reversal of the judgment of the court of appeals, and the consequent affirmance of that of the circuit court. All concur.

REVERSED.