THE PEOPLE *ex rel.* THE DECATUR AND STATE LINE RAILWAY COMPANY

*v.*

JOSIAH McROBERTS, Judge, etc.

1. EMINENT DOMAIN. The 13th section of the Bill of Rights of the constitution of 1870, placing restrictions upon the exercise of the right of eminent domain, is not merely prospective in its effect, but operated *in presenti,* without legislative action.

2. SAME—*mode of fixing compensation.* It provides that private property shall not be taken or damaged for public use without just compensation; and that such compensation, when not made by the State, shall be ascertained by a jury, as shall be prescribed by law. The requirement that the compensation shall be ascertained by a jury is affirmative in its character, and must imply an exclusion of any other mode of fixing the compensation. If there was no law under which a jury could be impaneled for the ascertainment of such compensation, and the legislature neglected to provide one, the constitution would not, for that reason, be in abeyance; but until such law was provided, the right of eminent domain could not be exercised.

3. The compensation for property damaged, as well as taken, must be ascertained by a jury. It can be neither damaged nor taken without compensation; and there can be no entrance upon or possession of land for public use until the compensation for the land damaged, as well as taken, has been paid.

4. SAME—*act of June 22, 1852.* The first six sections of the Act of June 22, 1852, which provides for the filing of a petition, due notice to the persons interested, the appointment of commissioners, their inspection of the premises, and a report of the compensation assessed by them to be filed with the clerk of the Circuit Court, are in no sense in conflict with the constitution of 1870.

5. But the 7th section, which makes the decision of the commissioners conclusive upon the parties before they can have the benefit of a trial by jury, is inconsistent with the letter of the constitution. The assessment and report of the commissioners should conclude no owner of the land, and confer no right upon the corporation, unless the land owner assents, by an acceptance of the compensation, or in some other manner.

6. So section 9, which requires the execution of a bond upon taking an appeal from the decision of the commissioners to the Circuit Court, is clearly annulled by the new constitution.

7. And section 12, which permits the land to be entered upon during the pendency of the appeal, is manifestly inconsistent with the Bill of Rights.

8. But there is enough of the act which is not inconsistent with the constitution to enable private property to be taken for public use. The commissioners may act, and, after notice of the filing of their report, parties may bring the proceedings before the Circuit Court, as provided in sections 10 and 11 of the act. If satisfied with the report, and the compensation fixed, the latter may be accepted, and then an adjustment can be made by those who are competent to act. If the report is not satisfactory, then notice should be given to the opposite party, as provided in the sections referred to, so that a trial can be had in the Circuit Court.

9. But the party whose land is sought to be taken ought not to be compelled to pay costs if the assessment of the commissioners should be affirmed or not increased.

10. In this case a peremptory mandamus was awarded, requiring the Circuit Court to appoint the commissioners, as provided by the Act of 1852.

11. Mr. JUSTICE BREESE, dissenting, holds that the Act of 1852 is so far inconsistent with the constitution that private property can not be taken for public use under it, and that the peremptory writ should have been denied.

The Decatur and State Line Railway Company was incorporated under a special charter granted by the Legislature of the State of Illinois on the 24th day of March, A. D. 1869. By the terms of this charter the company was authorized to condemn lands for right of way "in the manner provided by the general laws of this State."

On the 30th day of September, A. D. 1871, the relator applied to the Hon. Josiah McRoberts, presiding judge of the Circuit Court of Will County, for the appointment of commissioners, under the Act of 1852, to appraise certain lands in said county required by relator for right of way.

The regularity of the petition and notices was admitted, but the judge refused to appoint the commissioners.

An alternative writ of mandamus was sued out of this court, to which return has been made by the judge, admitting the facts alleged in the writ, and assigning as a reason for refusing to appoint the commissioners, that the constitution of 1870 had,

in his opinion, repealed the right of way act of 1852. Motions were duly entered by the relator to quash the return, and that the peremptory writ should issue.

The question arises upon the sufficiency of the return.

Mr. George C. Campbell, for the relator.

Mr. G. D. A. Parks, for the respondent.

Mr. Justice Thornton delivered the opinion of the Court:

An alternative writ of mandamus was awarded by this Court, requiring the presiding judge of the Circuit Court of Will County, to show cause why he refused to appoint commissioners to fix the compensation to be made to parties for the right of way over their lands; and to assess damages in accordance with the laws of the State.

The return of the respondent, and the argument submitted, contend that the law of June 22d, 1852, providing for the condemnation of land, by virtue of the exercise of the right of eminent domain, has become a nullity, by the adoption of the present constitution.

The following is the constitutional provision, which is assumed to be inconsistent with the act of 1852:

"Private property shall not be taken or damaged for public use, without just compensation. Such compensation, when not made by the State, shall be ascertained by a jury, as shall be prescribed by law. The fee of land, taken for railroad tracks, without consent of the owner thereof, shall remain in such owners, subject to the use for which it is taken." Sec. 13 of Bill of Rights.

A constitution must be expounded in its plain and obvious meaning. It is an instrument, the truest exposition of which is that which best harmonizes with its design and object.

As has been said by Judge Story:

"Constitutions are of a practical nature, founded on the common business of life, designed for common use, and fitted for common understandings. The people make them, the peo-

ple adopt them, and the people must be supposed to read them with the help of common sense."

Is the section of the Bill of Rights prospective in its effect, and inoperative without legislative action? The right of property, thus intended to be secured, can not depend upon the mere will of the legislature. The prime object of a Bill of Rights is, to place the life, liberty, and property of the citizen beyond the control of legislation, and to prevent either legislatures or courts from any interference with or deprivation of the rights therein declared and guarantied, except upon certain conditions. It would be the merest delusion to declare a subsisting right as essential to the acquisition and protection of property, and make its enjoyment dependent upon legislative will or judicial interpretation. Such absurdity can not be ascribed to the framers of the instrument. Neither can the constitution be regarded as a plaything; to be made the sport of any department of the government; to be annulled by nonaction, or to be operative at the mere pleasure of those who are bound to obey and respect it ; but it is a solemn instrument emanating from the people, declaratory of rights and restraining in its operation, and which can only be abrogated by the sovereignty which created it.

The intention of the instrument must prevail ; and in its ascertainment we must look at the consequences of a particular construction. If a literal meaning involve a manifest absurdity it should never be adopted.

Was it the design to leave the determination of the necessity of a jury wholly to legislative discretion ? If so, the section is not only unnecessary, but absurd ; for the former constitution did not make a jury indispensable; and the act of 1852 provided for the appointment of three commissioners to assess damages upon proceedings to condemn land, with the right of appeal, upon the execution of a bond, and a trial by jury in the circuit court; and this legislation had been sustained by the courts.

The present constitution differs from the constitution of 1848,

in the requirement that the compensation shall be ascertained by a jury. It evidently was intended to provide a different mode, and to require that a jury shall act before private property shall be, in any respect, endangered. There must have been an object in the additional restriction. It is affirmative in its character, and must imply an exclusion of any other mode. If there is no law upon the subject, and the legislature neglects to provide one, the constitution can not be in abeyance. This would defeat the object, and make the limitation operative or nugatory at the pleasure of the legislature.

Suppose that the words, " as shall be prescribed by law," had been omitted in the section, no one would doubt for a moment that the section went into effect *in presenti;* and that, until the enactment of a proper law, if there was none, the right of eminent domain could not be exercised. It would have been the duty of the legislature, then as well as now, to provide for the empaneling of a jury, and the machinery necessary to make the section effectual. Private property was protected, and its inviolability secured from damage or seizure until the ascertainment, by a jury, of just compensation, and its payment. The inhibition of any other mode of determining the compensation is independent of, and complete without the words quoted. They merely declare the duty of the legislature.

As was said by the counsel for the respondents :

" Condemnation is forbidden without just compensation ; just compensation can not be made without ascertainment, and ascertainment is impossible except by a jury."

He also happily illustrates the sense of the section under consideration, by other sections of the same article.

Section 12 prohibits imprisonment of a debtor, unless upon refusal to deliver up his estate, "as shall be prescribed by law." Does the freedom of the citizen from incarceration, therefore, depend upon the action of the legislature? We apprehend not. He is secure from imprisonment for debt except

upon a refusal to surrender his estate for the benefit of his creditors, or there is strong presumption of fraud; and until the manner of surrender is provided by law.

Section 16 forbids the quartering of troops in the house of the citizen, even in time of war, " except in the manner prescribed by law." The failure to prescribe the manner can not destroy the prohibition.

This right to take private property for public use is a high prerogative of sovereignty, controlled by the constitution, and can be exercised only subject to the Bill of Rights, and the limitations therein contained.

The section under consideration differs from the late constitution in another respect. It declares that private property shall not be taken or *damaged* for public use, without compensation. The word " damaged " is peculiar to the present constitution. We shall not undertake to determine the meaning and effect of this additional word, in all the phases in which it might be viewed, but only with reference to the proceedings before us.

When land is taken for public use, there is an appropriation of it; the owner is deprived of the use and enjoyment; and the control and possession are transferred to the corporation. The fee only remains in the owner, subject to the use for which the land is taken. The damage, if to the land which may be taken, must precede the actual taking ; if to contiguous lands, it would be consequent upon the taking.

The compensation for property damaged as well as taken, must be ascertained by a jury. It can be neither damaged nor taken without compensation; and it follows, as a necessary sequence, that there can be no entrance upon, or possession of, land for public use, until the compensation for the land damaged, as well as taken, has been paid.

The important question remains, whether the law of 1852 is so far inconsistent with the constitution as to render the former inoperative ?

The first section of the schedule provides, " That all laws in force at the adoption of this constitution, not inconsistent

therewith, . . . . shall continue to be as valid as if this constitution had not been adopted."

From the view we have taken of the constitutional guaranties, the conclusion is inevitable that the owner of land proposed to be condemned, must not be deprived of a regular trial by jury. He must not be fettered by any provision of law, which may deprive him of a fair and speedy trial, or which may prejudge his rights, before a submission of them to a jury. His land must not be taken or damaged without his consent, until the compensation has been fixed and paid.

The first six sections of the Act of June 22d, 1852, are, in no sense, in conflict with the constitution. They provide for filing a petition; due notice to the persons interested; the appointment of commissioners; their inspection of the premises; and a report of the compensation assessed by them, to be filed with the clerk of the circuit court.

Section 7, which makes the decisions of the commissioners conclusive upon the parties, before they can have the benefit of a trial by jury, is inconsistent with the letter of the constitution. The assessments and reports of the commissioners should conclude no owner of the land, and confer no right upon the corporation, unless the land owner assents—by an acceptance of the compensation, or in some other manner.

The requirement of the execution of an appeal bond, by the party who may desire to appeal from the estimates or decisions of the commissioners, is also a serious obstacle to a trial by jury. No hinderance, however slight, should be interposed to the enjoyment of this right. A non-resident land owner might be deprived of his right to bring the proceedings before the circuit court, and submit them to a jury, if required to give bond. The party, whose land is sought to be taken, ought not to be compelled to pay costs, if the assessment of the commissioners should be affirmed or not increased. Section 9, providing for the bond, is clearly annulled by the constitution.

Section 12, which permits the land to be entered upon, during the pendency of the appeal, is manifestly inconsistent with the Bill of Rights.

It is not unreasonable that parties, after notice of the filing of the report of the commissioners, should bring the proceedings before the circuit court, as provided in sections 10 and 11. If satisfied with the report and the compensation fixed, the latter may be accepted, and thus an adjustment can be made by those who are competent to act. If the report is not satisfactory, then notice should be given to the opposite party, as provided in the sections referred to, so that a trial can be had in the circuit court.

There is enough of the act, which is not inconsistent with the constitution, to enable private property to be taken for public use. The filing of the petition, the full notice required of the application to appoint commissioners; their appointment and subsequent inspection of the property; the making an assessment; filing a report, and giving notice thereof, are merely initiatory of the proceeding for condemnation. Their action concludes the rights of no person without his consent. The trial by jury follows, without any unreasonable delay, and without any hinderance.

But until the ascertainment of the compensation, by a jury, if either party desire one, and the payment thereof, no right is acquired to enter upon, use, or apply the land for the purposes in the petition indicated. The land can neither be *damaged* nor taken until full compliance with the constitution.

The corporation may be delayed in the prosecution of the enterprise contemplated; but such delay is not so serious as a construction which would fritter away the constitution and jeopardize private property.

When it is declared that private property shall not be damaged for public use, without just compensation, to be ascertained by a jury, it is meant to secure it from intrusion until the conditions of possession are fulfilled. The property must be regarded as sacred and inviolable until there is a full compliance with the obvious sense of the constitution.

Subject to the views expressed in this opinion, the commissioners may rightfully act; and we are of opinion that a peremptory *mandamus* should be awarded for their appointment.

It is, therefore, ordered that the peremptory writ issue.

*Mandamus awarded.*

SHELDON, J. I concur in the conclusion that a writ of *mandamus* should issue in this case, but do not concur in all the views expressed in the opinion of the majority of the Court in arriving at such conclusion.

Mr. JUSTICE BREESE, dissenting :

I do not concur either in the argument or conclusions of this opinion. It seems to me the act of 1852, in its most important features, is repugnant to the constitution of 1870. Section 13 of Article II, declares, in language the most emphatic, "that private property shall not be taken or damaged for public use without just compensation. Such compensation, when not made by the State, shall be ascertained by a jury, or shall be prescribed by law. The fee of the land taken for railroad tracks, without consent of the owners thereof, shall remain in such owners, subject to the use for which it is taken."

The act in question authorizes the commissioners to enter upon the land of the owner without his consent, and in defiance of him, and tread down and destroy the grass, herbage, and crops that may be growing upon the line they may be examining which the road shall occupy. This entry is a trespass, and is attended with damages, small, it may be, but, nevertheless, the property is "damaged," and in a mode not permitted by the constitution. The amount of the damage is not the point. It is sufficient to show that the act is, in this particular, repugnant to the constitution. The inviolability of a man's possession, which this clause in the Bill of Rights was intended to preserve, is disregarded. This can not be permitted without the sanction of a jury, and this, the only safeguard the people have, is taken from them by this decision of the Court.

It was the evident intention of the framers of this article, and of the people in ratifying it, that a land owner should not be disturbed in the enjoyment of his property, or damage done

to it, by which the public was to be benefited, save by the verdict of a jury giving him just compensation.

But it is said a trial by jury is provided by the act. The land owner can appeal to the circuit court. I can not believe it was the intention of this article, that the owner of land, whose property is sought to be taken from him against his will, should, in order to a trial by jury, be put to the trouble and expense of an appeal. But while the appeal is pending, the company are in possession, doing damage more or less.

In another respect the act of 1852 is inconsistent with this article. By the act the fee in the land is in the company effecting its condemnation. The article vests the use only.

In my judgment, it was the intention of the convention to overthrow all previous systems in force for the condemnation of land for public use, and they supposed they had done so by the article in question.

It was their intention also that it should go into effect immediately and not await the action of the legislature, who might never act, and thus, by non-action, render this most valuable provision a dead letter.

I have not time to enter extensively into the argument. I give my conclusions after great deliberation, and am not convinced of my error by the opinion filed. If, as is therein stated, the report of the commissioners amounts to nothing, why, it may be asked, should the circuit judge of Will County be compelled, by mandamus, to appoint them? I am of opinion the mandamus was properly refused.