(No. 21935.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MURRAY HUMPHREYS, Plaintiff in Error.

*Opinion filed October 21, 1933.*

WILLIAM W. SMITH, and EVERETT JENNINGS, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, CHARLES S. DOUGHERTY, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Per CURIAM: Murray Humphreys was arrested without a warrant by Chicago police officers on November 1, 1932. At the time of his arrest he was standing in a corridor outside the door to an office on the fourteenth floor of No. 1 North LaSalle street, in Chicago, and was committing no offense. He was in the company of Charles Fischetti, for whom a vagrancy warrant had been issued by Judge Lyle in 1930. After Humphreys was arrested he was searched and a loaded automatic pistol was found beneath his vest. He was later charged, tried and convicted by a jury in the municipal court of Chicago of the offense of carrying a concealed weapon upon his person, in violation of the Deadly Weapons act, (Smith's Stat. 1933, chap. 38, p. 1021,) and given the maximum combined penalties of one year imprisonment and $300 fine. The present writ of error is sued out to review the record, and as constitutional questions are involved this court has jurisdiction. *People* v. *McGurn,* 341 Ill. 632.

Before his trial began, Humphreys filed a petition and made a motion to suppress all evidence of his arrest and

search and of the finding of the pistol upon him, on the ground that the arrest and search and the seizure of the pistol violated the law and were in violation of the rights guaranteed to him by sections 2, 6 and 10 of article 2 of the constitution of Illinois. After hearing evidence and the argument of counsel the trial court overruled the motion and denied the petition to suppress. This action constitutes the first ground relied upon for reversal and in the view we take of the case is the only error assigned which need be considered in this opinion.

Article 2 of our constitution is termed the bill of rights. Its twenty sections are fundamental charter reservations of liberty and rights to the people as against possible encroachments from the executive, judicial or legislative branch of government. Every court is bound to enforce these, as well as all other, constitutional provisions, with no discretion in any particular case and without regard to whether in some instances the public good might temporarily be better served by disregarding them. (*People* v. *Hatz,* 327 Ill. 433.) In the present case, Humphreys, in his motion and petition to suppress all evidence of his arrest and search, has invoked in his behalf the provisions of section 2, providing that no person shall be deprived of life, liberty or property without due process of law; section 6, assuring all persons of their right to be secure against unreasonable searches and seizures; and section 10, providing that no person shall be compelled in any criminal case to give evidence against himself, etc. It is a consideration of the evidence pertaining to Humphreys' arrest and search with relation to these fundamental constitutional provisions that will control our decision in this case.

On the afternoon of Humphreys' arrest, police officers Drury and Howe went to room 1415 in a building located at No. 1 North LaSalle street, Chicago. There is no evidence that they went there in search of any particular person. They had no warrants in their possession for the

arrest or search of anyone or of the premises invaded, although Drury testified that vagrancy warrants for the arrest of Klondike O'Donnell and Charles Fischetti were lodged in a vault at the detective bureau, where he had last seen them soon after they were issued, in November, 1930. Officer Howe testified that he had seen the Fischetti *capias* on November 1, 1932, the day of the arrest. The name of T. J. Sullivan appeared on the door of the office at 1415. There was an outer room and two smaller rooms. The officers arrested and searched everyone in the front office, viz., Jack O'Brien, Tom Martin, Sam Alex and Tony Moreno. Officer Howe went into one of the private offices and arrested O'Donnell, Sullivan and Steady Looney, all the persons in that room. Officer Howe immediately brought the last mentioned three men to the outer office. Drury then went into the other private office and placed William White, who was there alone, under arrest. On returning to the outer office, it being at least ten minutes after they first arrived there, Howe saw the forms of two men through the stained glass door, standing in the hall. He opened the door, took hold of them and pulled them into the office and said, "You are going in with the rest of them." These two men were the defendant, Humphreys, and Fischetti. Humphreys was searched and a pistol found on him, as above stated.

Both Drury and Howe testified that they arrested Fischetti and O'Donnell because of the existence of vagrancy warrants for them in 1930 by Judge Lyle. They stated they had read in the newspapers that Patrick Berrell had been shot and killed at Shawano, Wisconsin, on July 21, 1932, and that they arrested Humphreys for that murder. They both testified that shortly after they read of the death of Berrell they were shown an anonymous letter by chief of detectives Shoemaker which he said had been received by him; that the letter was written and post-marked in Chicago, and that they were ordered to arrest Humphreys by

Chief Shoemaker in July, 1932. No envelope to show the date or place of mailing or the post-marks was produced at the trial. Officer Drury testified that he looked over the letter and that it said Humphreys had something to do with the murder. He further testified: "I never saw him between July and November 1. I made the arrest for that murder. I don't believe we talked to Shoemaker again after the date he showed us the letter in reference to Humphreys being wanted for the Berrell murder. Shoemaker did not say anything about lodging a warrant or complaint at that time. I don't know if it is a fact there was never any warrant issued. I did not try to get a warrant and never made any complaint to any of the judges during the time from July until November. I was never in Shawano. I read in the papers that Berrell had been killed, and we received a report from the Wisconsin authorities—the police officials."

Shoemaker testified that when he showed the anonymous letter to Drury and Howe he told them (in July, 1932) : "One of these fellows may be Humphreys, and if you see him arrest him and bring him in here to the bureau, and after we get him in we will see if we can get some witness to identify him." Both Shoemaker and Drury testified that they had heard that Humphreys and Berrell had had trouble, but when they were asked from whom they obtained the information they each refused to tell. The objection of the State's attorney to all such questions was in every instance sustained by the court. Officer Howe testified that he got his information concerning Humphreys from Shoemaker and Drury. Shoemaker stated that he made no investigation between July and November to determine who was guilty or who was wanted for the killing of Berrell in Wisconsin; that all he had on that subject was what he found out from the anonymous letter, together with information of union trouble between Berrell and Humphreys. He said that no person in Wisconsin had

told him between June and November, 1932, that they thought Humphreys had any connection with the Berrell murder, and that he had not communicated his suspicion on this subject to anyone there. As a reason for Humphreys' arrest Shoemaker said, "I had him arrested because I believe he was implicated in it [the Berrell murder] and could have some witnesses identify him, and when I found out they couldn't, that was gone, so then if Wisconsin didn't want him I couldn't give him to them. They could get a couple of good lawyers, but I wasn't going to help the lawyers make any big fee by putting a bum rap on him." Shoemaker also testified that on an occasion prior to the arrest of Humphreys on November 1, 1932, he had Humphreys arrested and brought into his office for the purpose of giving him "some fatherly advice;" that no messages of any kind were sent out for the apprehension of Humphreys after the Berrell murder, in June or July, 1932; that no warrant or *capias* was then or afterwards issued for Humphreys' arrest on any charge, and that no record was made in his department that Humphreys was wanted. Drury and Howe both testified that Humphreys was committing no offense in their presence when they arrested him.

From the foregoing recital of evidence on the motion to suppress it must be apparent that the arrest of Humphreys and the search and seizure of the pistol were illegal and in violation of his constitutional rights. Evidence thus obtained was improperly used to convict him. (*People* v. *McGurn, supra,* and cases there cited.) At the time of his arrest Humphreys was not committing any offense or disturbance, such as would authorize an arrest without a warrant. The officers had no warrant to arrest him and none had ever been issued. They had no warrant to search his person and none had ever been issued. Neither had they any warrant to search the offices where they made the other arrests at the same time. The test is not that the officers

found a gun upon Humphreys. That a gun was found did not change the wrongful arrest and search into a right. The constitutional guaranty must be applied to all alike, and if an arrest and search under the circumstances here is upheld, then the one barrier designed to protect persons from unlawful invasions of their persons and property would be destroyed.

In defense of their actions the police officers testified that Humphreys was arrested because they had reasonable grounds to believe that he was implicated in the murder of Berrell, which had occurred more than three months before that time. Their belief was founded upon a conversation had with Chief Shoemaker, after he had received an anonymous letter in July, 1932. This letter made no reference to Humphreys by name, but Shoemaker told his subordinates that Humphreys might be one of the three persons referred to. "One of these fellows may be Humphreys," said Shoemaker, and he then told the two officers that if they saw Humphreys to "arrest him and bring him in here to the bureau, and after we get him we will see if we can get some witness to identify him." In other words, no search was to be instituted for Humphreys, suspected of murder. He was just to be brought in if the officers happened to see him. From these apathetic directions it is evident that Shoemaker placed little or no weight on the anonymous letter. This indifferent attitude certainly furnishes no reasonable ground to believe he thought Humphreys was implicated in a murder, such as would justify his arrest without a warrant, when pains had been taken to secure numerous warrants for others charged only with vagrancy. Still more convincing is the fact that Wisconsin authorities had never asked the Chicago police to arrest Humphreys. Shoemaker testified that even after Humphreys was arrested the Wisconsin authorities said they did not want him; that he placed no charge against him because he "wasn't going to help the lawyers make any

big fee by putting a bum rap on him." Thus Shoemaker virtually admitted that no reasonable grounds existed to believe Humphreys guilty of murder.

While it is the rule in this State that an officer has the right to arrest without a warrant where he has reasonable ground for believing that the person to be arrested is implicated in a crime, (*People* v. *Swift,* 319 Ill. 359,) yet the application of this rule in any given case is a mixed question of law and fact. To justify an arrest without a warrant the ground for belief that the person to be arrested is guilty of a crime must be such as would influence the conduct of a prudent and cautious man under the circumstances. (*Kindred* v. *Stitt,* 51 Ill. 401.) The evidence here was clearly insufficient to justify Humphreys' arrest without a warrant. It shows that his arrest was largely accidental, due to his belated appearance outside the door of an office which the officers had previously raided. No prudent or cautious man would, under the circumstances here, have been influenced sufficiently by the anonymous letter received three months earlier, and to which so little attention was paid, to make an arrest without a warrant in the belief that the person arrested might have been implicated in a crime in another State, whose authorities had not even requested that such arrest be made.

As Humphreys' arrest was illegal it necessarily follows that the subsequent search of his person was unlawful, and the evidence of his offense was unlawfully and illegally obtained and used against him, contrary to constitutional guaranties. The trial court erred in not allowing the petition and motion to suppress the evidence unlawfully obtained. Without such evidence the record contained no competent proof sufficient to sustain Humphreys' conviction of the offense with which he was charged.

The judgment of the municipal court of Chicago is reversed.

*Judgment reversed.*