(No. 72272.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PAUL DiGUIDA, Appellee.

*Opinion filed October 1, 1992.—Rehearing denied November 30, 1992.*

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and

Renee Goldfarb, Donald J. Mizerk and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Defender, of counsel), and Jeffrey P. Smith, of Engelman & Smith, of Skokie, for appellee.

James A. Klenk, Alan J. Mandel and Gregory Naron, of Sonnenschein, Nath & Rosenthal, and Joseph P. Thornton, all of Chicago, for *amici curiae* Chicago Tribune Co. *et al.*

Rene A. Torrado, Jr., of Vedder, Price, Kaufman & Kammholz, and Laurel G. Bellows, all of Chicago, for *amicus curiae* Chicago Bar Association.

Harvey Grossman, Diane Geraghty and Michael Seng, all of Chicago, for *amicus curiae* ACLU of Illinois.

Mathias W. Delort, of Odelson & Sterk, Ltd., of Evergreen Park, and Roslyn C. Lieb and James E. Vander Arend, of Chicago, for *amici curiae* Independent Voters of Illinois *et al.*

J. Brian Heller, of Washington, for *amicus curiae* Rutherford Institute of Illinois.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Paul DiGuida, was convicted of criminal trespass to real property (Ill. Rev. Stat. 1987, ch. 38, par. 21—3(a)) after refusing to leave the premises of a grocery store where he had been soliciting signatures for a political petition. Defendant appealed his conviction, and the appellate court reversed (215 Ill. App. 3d 913). We granted the State's petition for leave to appeal (134 Ill. 2d R. 317), and allowed a number of groups and organizations to submit briefs as *amici curiae* (134 Ill. 2d R. 345).

The issue presented for review is whether a private store's invocation of the criminal trespass to land statute, in order to exclude a circulator of a political nominating petition from its premises, is violative of the free speech and free elections provisions of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§2, 4; art. III, §3). This is a question of first impression for this court.

## BACKGROUND

On December 12, 1987, defendant was standing inside the cart-control area of a Dominick's grocery store in Evanston, gathering signatures on a nominating petition for a Cook County political candidate. The cart-control area, located between the store entrance and the public sidewalk, is owned by Dominick's. It is covered by an overhang and surrounded by a railing which prevents carts from rolling into the parking lot. Defendant was standing on Dominick's property, approximately 25 feet from the entrance, when Ted Scanlon, a store manager, approached defendant and asked him to leave. Scanlon explained that Dominick's did not allow soliciting on its property. Defendant responded that he did not have to leave, as he was on public property, and could do what he wanted. Scanlon informed defendant that he would call the police if defendant did not leave. Defendant told Scanlon to go ahead, as he was doing nothing wrong. According to his own testimony, defendant then walked around the block in order to avoid the police. After the police had left, defendant returned to the cart-control area and continued to solicit signatures. The police returned, informed defendant that he was on private property, and told him that he would be arrested if he did not leave. Defendant refused to leave. He was then arrested and charged in a misdemeanor complaint with criminal trespass to land.

At a bench trial, Scanlon testified that Dominick's allowed people to solicit if they had permission. Candidates for public office were allowed to walk once through the store, but were forbidden to stand outside it afterward. In response to questioning, Scanlon further testified that outside the store there were no signs saying "No Soliciting," and that inside the store there was a bulletin board where people could post messages.

Defendant called Andrea Raila to testify in his defense. Raila was a campaign manager who solicited signatures for political candidates and directed others in collecting signatures. Raila testified that she had suggested that other solicitors go to Dominick's, and that she had solicited signatures there herself 20 or 25 times. She had never been asked to leave the premises. Raila further stated that Dominick's personnel "either permit people to stand within a couple of feet from the doorway or, if it is too cold, they will let them stand within the entrance."

At the conclusion of trial, the court found defendant guilty of criminal trespass to land, holding that his first amendment rights were curtailed on private property. Defendant was granted supervision, and ordered to perform 20 hours of community service.

Defendant appealed his conviction. He conceded that his activities were not protected under the first amendment of the United States Constitution, and the appellate court agreed. However, the appellate court reversed defendant's conviction (215 Ill. App. 3d 913), holding that his activities were protected by the free speech and free and equal elections provisions of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§2, 4; art. III, §3). Because this case presents a question under the Illinois Constitution which arose for the first time as a result of the appellate court's decision, we accepted the

State's petition to appeal as a matter of right (134 Ill. 2d R. 317).

## FIRST AMENDMENT RIGHTS

In several relevant cases, the United States Supreme Court has delineated the first amendment rights of individuals to express their views in privately owned forums. An overview of those cases will reveal the extent of first amendment guarantees in circumstances similar to those in the case under review.

In *Marsh v. Alabama* (1946), 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276, the appellant, a Jehovah's Witness, had attempted to distribute religious literature in the business district of Chickasaw, Alabama, a town wholly owned by a private corporation. The town consisted of residential buildings, streets, a system of sewers, a sewage disposal plant, and a business block which was used by residents as their shopping center. Both the town and its shopping district were accessible to and freely used by the public in general. Inside the stores, the corporation had posted notices stating that the premises were private property and that no solicitation of any kind would be permitted without written permission. When told that she could not distribute her literature and must leave the town, appellant refused to do so, and was arrested for violating Alabama's criminal trespass statute. The Supreme Court reversed appellant's conviction, holding that private ownership of the town was not a sufficient reason to justify the State's permitting a corporation to restrict fundamental liberties of its citizens. Central to the Court's reasoning was its finding that the company town functioned like any other town.

Twenty-two years later, the Court applied the rationale of *Marsh* to the picketing of a store in a shopping center. (*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.* (1968), 391 U.S. 308, 20 L.

Ed. 2d 603, 88 S. Ct. 1601.) In *Logan Valley*, a supermarket tenant in the center employed an exclusively nonunion staff. Nonemployee members of a union began to picket the market. The picketing, which was peaceful, took place in the parcel pickup area of the store and portions of the adjoining parking lot. The market and shopping center obtained an injunction against the picketing, requiring that it be confined to areas outside the shopping center. The only nearby public area where picketing was possible was atop berms separating the shopping center from the public highway. The target of petitioners' picketing was located 350 to 500 feet away from the berms, and the picketers would have found it difficult to communicate their ideas from that distance. Further, they would have been endangered by nearby traffic. The Court found that the large shopping center, which contained roads and sidewalks, was the functional equivalent of the company town in *Marsh* and must be treated in the same manner for purposes of the first and fourteenth amendments.

Four years later the Court reconsidered the *Logan Valley* doctrine in *Lloyd Corp., Ltd. v. Tanner* (1972), 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219. *Lloyd* involved a 50-acre shopping center containing 60 stores, parking facilities, malls, private sidewalks, gardens, an auditorium, and a skating rink. There were no public streets or sidewalks within the complex. The center employed 12 security guards, commissioned by the city, who were uniformed and licensed to carry firearms. Signs were posted indicating that permission to use the areas could be revoked at any time. Although the center allowed limited use of its malls by the American Legion, Salvation Army, and Volunteers of America, it denied similar use to other civic and charitable organizations. Political use was generally forbidden, but presidential

candidates had been allowed to speak in the auditorium. The center had a strict policy against handbilling.

In 1968, five war and draft protesters entered the shopping center in order to pass out handbills protesting American military operations in Vietnam. Security guards told the protesters to leave, and they did so in order to avoid arrest. The protesters then secured an injunction against interference with their handbilling. The court of appeals subsequently affirmed the action of the court below. Upon further appeal, the Supreme Court rejected the argument that, since the center was open to the public, the private owner could not enforce restrictions against handbilling. Further, the Court found that, unlike the picketing in *Logan*, the handbilling in *Lloyd* had no relation to any purpose for which the center was being used. The Court pointed out that the first and fourteenth amendments protect against State action, not action by the owner on private property used nondiscriminatorily for private purposes only. The Court also emphasized that property does not lose its private character simply because the public is generally invited to use it for designated purposes.

> "Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large ***." (*Lloyd*, 407 U.S. at 569, 33 L. Ed. 2d at 143, 92 S. Ct. at 2229.)

Holding that there was no dedication of Lloyd Center to public use so as to entitle the protesters to their asserted first amendment rights, the Court reversed.

In *Hudgens v. N L R B* (1976), 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029, the Court followed the rationale and holding of *Lloyd* rather than that of *Logan*

*Valley*. *Hudgens* involved the picketing by striking union members of their employer's retail store, which was located in a privately owned shopping center. Threatened with arrest for trespass, the union members left. The union then filed an unfair labor practice charge against the employer with the National Labor Relations Board. Upon review, the Court held that the striking employees in *Hudgens* had no first amendment right to enter the shopping center to advertise their strike. The protesters could have distributed the handbills on any public street, any sidewalk, or in any building of the city. The Court then remanded, stating that the respective rights of the parties were to be decided under the criteria of the National Labor Relations Act alone.

In its most recent shopping center case, the Supreme Court was asked to determine whether the first, fifth and fourteenth amendment rights of a property owner outweighed the rights of those wishing to express their views while on the owner's property. (*Pruneyard Shopping Center v. Robins* (1980), 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035.) In *Pruneyard*, high school students soliciting support for their opposition to a United Nations resolution had set up a table inside a large shopping center in order to distribute pamphlets and to ask passersby to sign a petition. A security guard told the students to leave, because their activity violated the center's policy barring any publicly expressive activity not directly related to the center's commercial purposes. After the students left the premises, they sought to enjoin the shopping center from denying them access. The California Supreme Court found that the students' activity was protected by the free speech and petition provisions of the California Constitution. The United States Supreme Court affirmed, holding that the California Supreme Court's decision did not conflict with the fifth and fourteenth amendments' prohibition against the taking

of public property or with the owner's free speech rights under the first and fourteenth amendments. The Court pointed out that a State may adopt in its own constitution individual liberties more expansive than those conferred by the Federal Constitution. (*Pruneyard*, 447 U.S. at 81, 64 L. Ed. 2d at 752, 100 S. Ct. at 2040, citing *Cooper v. California* (1967), 386 U.S. 58, 62, 17 L. Ed. 2d 730, 734, 87 S. Ct. 788, 791.) Justice Marshall, in concurring, applauded the Court's decision, stating that it was "part of a very healthy trend of affording state constitutional provisions a more expansive interpretation than this Court has given to the Federal Constitution." *Pruneyard*, 447 U.S. at 91, 64 L. Ed. 2d at 758, 100 S. Ct. at 2046 (Marshall, J., concurring).

## CONSTITUTIONAL RIGHTS IN OTHER JURISDICTIONS

Following the decision of the California Supreme Court in *Robins v. Pruneyard Shopping Center* (1979), 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854, several States have found greater protection of free speech and free elections in their constitutions than in the first and fourteenth amendments to the United States Constitution. In *Robins*, the court stressed the importance of petitions in effecting change by the citizenry through initiative, referendum and recall. Similarly, the Supreme Court of Washington underlined its State's vital interest in the initiative process when finding that the rights of political petitioners outweighed the property rights of a private shopping center owner. *Alderwood Associates v. Washington Environmental Council* (1981), 96 Wash. 2d 230, 635 P.2d 108.

The Oregon Court of Appeals also found the difficulty of obtaining signatures for initiative and referendum petitions to be the most important consideration in determining that political petitioners had a right to circulate

petitions in a large department store. (*State v. Cargill* (1990), 100 Or. App. 336, 786 P.2d 208.) Like the Oregon court, the Supreme Court of Massachusetts found, in a case involving the rights of political petitioners to solicit signatures in the largest shopping center in the common-wealth, that the basic right of free election would be sub-stantially impaired in the absence of access to an area which provided maximum personal contact with voters. *Batchelder v. Allied Stores International, Inc.* (1983), 388 Mass. 83, 445 N.E.2d 590.

Using an analysis reminiscent of *Marsh*, but rejected by the United States Supreme Court in subsequent shop-ping center cases, the Supreme Court of Colorado found that a mall could not exclude citizens engaged in nonvio-lent political speech. (*Bock v. Westminster Mall Co.* (Colo. 1991), 819 P.2d 55.) Because the mall functioned as a latter-day public forum, and because governmental agencies were located on the premises, the court found both the public function and the State action that are necessary to call State constitutional guarantees of free speech into play.

In *State v. Schmid* (1980), 84 N.J. 535, 423 A.2d 615, the Supreme Court of New Jersey examined the case of a nonstudent who was arrested for trespass after distrib-uting and selling political materials on the campus of Princeton University. Unable to determine whether the first amendment would protect defendant's rights, the court found that the State constitution guaranteed his rights of speech and assembly not only against govern-mental bodies but under some circumstances against pri-vate persons as well. Because the university has a pur-pose of encouraging free inquiry and expression and because it cultivates public involvement in academic life, the defendant had a right to conduct his activities on campus. However, the university was entitled to fashion

reasonable rules governing the time, place, and manner of such activities.

Unlike those in the above States, courts in other jurisdictions have found that their State constitutions provided no greater protection for free speech and free elections than that provided by the first amendment to the United States Constitution. In *State v. Felmet* (1981), 302 N.C. 173, 273 S.E.2d 708, the Supreme Court of North Carolina found no infringement under the State constitution of the rights of a solicitor of political signatures who had been arrested for trespass in a large, private mall.

The Supreme Court of Connecticut, in *Cologne v. Westfarms Associates* (1984), 192 Conn. 48, 469 A.2d 1201, also concluded that its State's constitutional shield for free expression was no broader than that of the first amendment. *Cologne* concerned the rights of solicitors for political petitions who wished to conduct their activities in a large shopping center despite objections of the owners. The court found that the State constitution did not allow free speech rights to be exercised upon every property affording a suitable opportunity for their enjoyment. If the property is private, its owners must consent to all such use by others. Declining to strike a balance between the interests of the two competing groups, the court stated that the legislature is in a better position to do so.

The high court of New York, urged to construe its State constitution's free speech provision more broadly than the first amendment, found instead that both have the same requirement of State action. (*S H A D Alliance v. Smith Haven Mall* (1985), 66 N.Y.2d 496, 488 N.E.2d 1211, 498 N.Y.S.2d 99.) *S H A D* concerned an attempt by nuclear power protesters to compel owners of a large mall to allow the distribution of pamphlets on the premises. The court examined the history of the State consti-

tution's free speech provision, constitutional doctrine, and traditional usage before concluding that a bill of rights is designed to protect individual rights against the government, not to settle conflicting interests among citizens. Although the mall had taken on many of the attributes and functions of a public forum, the court nevertheless found that the action involved private conduct, which is a matter for the legislature, not the constitution, to regulate.

In *Woodland v. Michigan Citizens Lobby* (1985), 423 Mich. 188, 378 N.W.2d 337, the Supreme Court of Michigan also concluded that the State constitution did not prohibit owners of large private malls from denying access to private individuals seeking to exercise their rights of free expression, assembly and petition. Moreover, the Michigan court found no constitutional protection for those wishing to gather signatures on initiative petitions while on privately owned property. The court recognized the importance of the right of initiative in Michigan's constitutional scheme, but found that the framers did not intend through that provision to regulate the conduct of private parties. Finding the reasoning of the Connecticut Supreme Court in *Cologne* to be persuasive, the *Woodland* court also refused to balance the interests of competing private groups.

Finally, in *Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Insurance Co.* (1986), 512 Pa. 23, 515 A.2d 1331, the Supreme Court of Pennsylvania examined its State constitution in the context of political expression, and found that its bill of rights was a limitation only on the power of government. According to the court, adjustment of the enumerated rights is not a matter of constitutional dimensions, but is dependent on a body of civil law, both common and statutory, which governs relationships among indi-

viduals. *Western Pennsylvania Socialist Workers*, 512 Pa. at 28, 515 A.2d at 1335.

## FREE SPEECH PROVISION OF THE ILLINOIS CONSTITUTION

Although defendant acknowledges that the Federal Constitution did not shield his expressive activities, he contends that the more liberal provisions of the Illinois Constitution gave him the right to solicit political signatures at Dominick's. Various *amici curiae* join defendant in urging that we abandon what has been termed the "lockstep doctrine." (See McAffee, *The Illinois Bill of Rights and our Independent Legal Tradition: A Critique of the Illinois Lockstep Doctrine*, 12 S. Ill. U. L.J. 1 (1987).) Under this doctrine the court would consistently apply decisions of the United States Supreme Court based on Federal constitutional provisions to the construction of comparable provisions of the State constitution. However, this court has not found itself bound in every case requiring State constitutional construction by doctrine derived from Supreme Court interpretation of the Constitution of the United States. Rather, the court has looked to the intent behind our constitution in order to determine whether comparable provisions should receive a similar interpretation. As this court has previously stated, where the language of the State constitution, or where debates and committee reports of the constitutional convention show that the Framers intended a different construction, it will construe similar provisions in a different way from that of the Supreme Court. *People v. Tisler* (1984), 103 Ill. 2d 226, 245.

Accordingly, in *Village of South Holland v. Stein* (1940), 373 Ill. 472, the court found that use of the word "publish" in the State constitution's free speech provision gave broader protection than would the first amendment to those soliciting publication subscriptions without

a solicitor's permit. In *People ex rel. Daley v. Joyce*
(1988), 126 Ill. 2d 209, the court once again compared
language of the Illinois Constitution with that of the
Federal Constitution. Consequently, the court found that
a statute giving the prosecution the right to a jury trial
in certain felony drug cases violated the Illinois Constitu-
tion although it was permissible under Federal constitu-
tional law.

However, after examining proceedings of the 1970
Constitutional Convention, the court determined in *Peo-
ple v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, that nothing
in the record indicated an intention to provide broader
protections against self-incrimination than those which
the Supreme Court had found in the fifth amendment.
Looking again to intent for guidance, the court stated in
*People v. Hoskins* (1984), 101 Ill. 2d 209, that it would
interpret section 6 of the Illinois Bill of Rights in the
same way that the Supreme Court had interpreted the
fourth amendment. The court was guided by the fact
that Illinois constitutional debates did not indicate an in-
tent to provide broader protection.

The court has found that the Illinois Constitution's
guarantee of due process to all persons (Ill. Const. 1970,
art. I, §2) stands separate and independent from the
Federal guarantee of due process. "While this court
may, in construing the Illinois Constitution's guarantee
of due process, look for guidance and inspiration to con-
structions of the Federal due process clause by the Fed-
eral courts, the final conclusions on how the due process
guarantee of the Illinois Constitution should be con-
strued are for this court to draw." (*Rollins v. Ellwood*
(1990), 141 Ill. 2d 244, 275.) Thus, this court has at vari-
ous times conducted an independent analysis of the Illi-
nois Constitution and found that certain provisions offer
our citizens greater protection than that enjoyed under
the United States Constitution.

Consistent with past practice, we begin our determination of the protection offered by the free speech provision of the Illinois Constitution by examining its language and history. In 1870, article II, section 4, of the constitution provided:

> "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense." (Ill. Const. 1870, art. II, §4.)

The wording of the 1970 free speech provision is substantially the same:

> "All persons may speak, write and publish freely, being responsible for the abuse of that liberty. In trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense." Ill. Const. 1970, art. I, §4.

During the 1970 Constitutional Convention, most of the debate over the free speech and press provision focused on the libel clause of the 1870 Constitution, with some delegates arguing that it should be rewritten to conform with the Federal Constitution. (Seng, *Freedom of Speech, Press and Assembly, and Freedom of Religion under the Illinois Constitution*, 21 Loy. U. Chi. L.J. 91, 112 (1989).) Elmer Gertz, chairman of the Bill of Rights Committee, explained why the delegates resisted incorporating the first amendment into the Illinois Constitution:

> "We felt that there were certain elements added by the more expansive language in the Illinois bill of rights, and we felt that every protection that the citizen has by reason of the First Amendment, of course, he would continue to have by reason of the Illinois language and perhaps added protections in the field of libel and perhaps in other fields." (3 Record of Proceedings, Sixth Illinois

Constitutional Convention 1403 (hereinafter Proceedings).)

The record of proceedings does not disclose what those "other fields" might be, nor was there any discussion by the delegates of the provision as it relates to free expression while on private property. Nevertheless, the delegates recognized that the Illinois Constitution may provide greater protection to free speech than does its Federal counterpart.

The first amendment of the United States Constitution provides:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (U.S. Const., amend. I.)

The first amendment thus specifically limits the powers of government, not that of private persons. By contrast, article I, section 4, of the Illinois Constitution does not expressly restrict its application to governmental interference. However, other provisions of the Illinois Constitution have consistently been interpreted as providing protection only against interference by the government, despite the lack of specific wording to that effect. This court has found, for instance, that the due process and equal protection provisions of the Illinois Constitution, as well as section 6 of article I, which creates a right of freedom from invasion of privacy, apply only to actions by government or public officials. *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 526, citing *USA I Lehndorff Vermoegensverwaltung GmbH & Cie v. Cousins Club, Inc.* (1976), 64 Ill. 2d 11, 20-21; *People v. Smith* (1979), 72 Ill. App. 3d 956, 964.

This court has not previously determined whether the free speech provision of the Illinois Constitution applies

to actions by individuals as well as by the State. As the appellate court pointed out, our decision in *Sterling* is not controlling in this case (*People v. Sterling* (1972), 52 Ill. 2d 287). *Sterling*, the only previous Illinois case involving free speech rights in a privately owned shopping center, was decided exclusively under the first and fourteenth amendments. The Federal Bill of Rights and the fourteenth amendment constrain only governmental action. (L. Tribe, American Constitutional Law 1147 n.1 (1978).) Although we reject any contention that free speech rights under the Illinois Constitution are in all circumstances limited to those afforded by the Federal Constitution, we believe nonetheless that the State action requirement of the first amendment is also present in article I, section 4, of the Illinois Constitution. (Ill. Const. 1970, art. I, §4.) We base that conclusion in part on well-established constitutional doctrine. As a member of the Constitution Research Group wrote concerning the Illinois Bill of Rights:

> "The classic concept of basic rights in the American constitutional tradition is that these rights are retained by the people as a protection against the government. The rights a person has against other persons are defined by common law and statute. These are not ordinarily regarded as constitutional matters." (Kauper, *The State Constitution: Its Nature and Purpose*, in Con-Con, Issues for the Illinois Constitutional Convention 25 (1970).)

Kauper's statement is consonant with the earliest pronouncement made by the court concerning the Illinois Bill of Rights:

> "The prime object of a Bill of Rights is, to place the life, liberty, and property of the citizen beyond the control of legislation, and to prevent either legislatures or courts from any interference with or deprivation of the rights therein declared and guarantied, except upon certain conditions." (*People ex rel. Decatur & State Line Ry. Co. v. McRoberts* (1871), 62 Ill. 38, 41.)

The court subsequently asserted that all sections of the Illinois Bill of Rights are "fundamental charter reservations of liberty and rights to the people as against possible encroachments from the executive, judicial or legislative branch of government." *People v. Humphreys* (1933), 353 Ill. 340, 342.

In its "Address to the People," the 1970 Constitutional Convention stated that it had "sought, though not always successfully, to adhere to the principle that a constitution should deal with structure of government, its powers, and its relation to the individual citizen." (7 Proceedings 2672 (Official text with explanations).) Absent was any stated intention that the constitution should attempt to set out the rights and powers of private individuals in their relations with others. Nor did the Constitutional Convention indicate that it intended to make fundamental changes in the principles underlying the 1870 Constitution. When the 1870 Constitution was adopted, the first amendment operated as a limitation only on the Federal government; the State bills of rights operated as a limitation only upon the powers of State government. G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 5 (1969).

The appellate court below noted that the States of Washington and California, whose free speech provisions resemble those of Illinois, have found that their constitutional guarantees are not limited by their terms to deprivation by government, but may in certain circumstances apply also to deprivation by private parties. (215 Ill. App. 3d at 926.) However, wording of the free speech provisions of Pennsylvania, Michigan, and New York is also substantially the same as that of article I, section 4 (Ill. Const. 1970, art. I, §4). Those States have found that their constitutional provisions bear only upon State action. (See *Western Pennsylvania Socialist Workers,*

512 Pa. 23, 515 A.2d 1331; *Woodland*, 423 Mich. 188, 378 N.W. 337; *S H A D*, 66 N.Y.2d 496, 488 N.E.2d 1211, 498 N.Y.S.2d 99.) As the New York Court of Appeals stated in *S H A D*, the State-action requirement performs a vital function:

> "Actions of the Federal Government are limited by the Federal Constitution's reservation to State governments of all powers not expressly granted it [citations]. State governments are not similarly restrained [citation]. State constitutional provisions, therefore, protect individual liberty by limiting the plenary power of the State over its citizens [citations]. Thus, State action is a crucial foundation for both private autonomy and separation of powers." *S H A D*, 66 N.Y.2d at 503, 488 N.E.2d at 1215-16, 498 N.Y.S.2d at 103-04.

After considering proceedings of the Illinois Constitutional Convention of 1970, past decisions of this court, the decisions of other jurisdictions, and generally accepted doctrine concerning the reach of constitutional provisions, we conclude that article I, section 4, of the Illinois Constitution of 1970 was not intended to apply to actions taken by private persons, but only to actions by the State. Such a requirement of State action is necessary in order to preserve the private autonomy of our citizens.

Having determined that State action is required to bring into play the free speech protections of the constitution, our next inquiry is whether that element exists in the case before us. The appellate court below found that use of the criminal trespass law constituted State action. The court relied upon the rationale of the Supreme Court in *Sullivan* and *Shelley* (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Shelley v. Kraemer* (1948), 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836). We find the Supreme Court's rationale to be inapplicable in this case. *Shelley* con-

cerned a State court's enforcement of a racially restrictive covenant in a lease between private parties. The Supreme Court found that the court's enforcement of the covenant constituted State action, thus violating the equal protection clause of the fourteenth amendment. However, as Professor Tribe has pointed out, "such reasoning, consistently applied, would require individuals to conform their private agreements to constitutional standards whenever, as almost always, the individuals might later seek the security of potential judicial enforcement." (L. Tribe, American Constitutional Law 1156 (1978).) Thus, courts and commentators have viewed *Shelley* with suspicion. L. Tribe, American Constitutional Law 1168 (1978).

In *Sullivan*, a newspaper, the defendant in a libel action, relied on the free speech provision of the first amendment for protection. The Supreme Court found State action, in that the court had applied a State rule of law governing libel actions which, according to petitioners, had placed invalid restrictions on their constitutional freedoms of speech and press. Thus, *Sullivan* was concerned with State application of a law which bore directly on free speech. In the case at bar, the State did not directly deny defendant's free speech rights. No prior restraints were imposed on defendant's free expression. He was arrested when a police officer enforced the criminal trespass to land statute (Ill. Rev. Stat. 1989, ch. 38, par. 21—3(a)).

Thus, defendant was not arrested because of the content of his speech or prosecuted because of his expressive activities. He was arrested and prosecuted simply because he refused to leave Dominick's property. The State action in this case was directed exclusively at enforcing the trespass law. Only indirectly did it interfere with defendant's right to free expression.

This court has previously stated the principle that an owner has the right to use his property in his own way and for his own purposes. (*Hannifin Corp. v. City of Berwyn* (1953), 1 Ill. 2d 28.) If invocation of the criminal trespass to land statute in cases such as that before us were found to constitute State action, a landowner would have to resort to self-help in order to remove free speech asserters from his private property. Only in such a way would the owner be free to use his own property as he wished.

We have concluded that an individual's constitutional right to free expression is effective only against public or quasi-public entities, and that use of the criminal trespass to land law does not constitute State action. Thus, whether defendant's speech was constitutionally protected becomes a question of whether Dominick's itself had taken on such a public aspect that it became a forum for free expression.

Dominick's is a freestanding grocery store. It is not a shopping center, or even a department store. No government agencies are located on the premises, nor does anything in the record suggest that governmental funds were used to build or maintain the store. Although Dominick's is surrounded by a private paved area, a public sidewalk runs in close proximity to the store's entrance.

The evidence is insufficient to conclude that Dominick's had presented itself as a forum for free expression. According to Andrea Raila, a witness for the defense, Dominick's personnel "permit people to stand within a couple of feet from the doorway" to collect signatures on political petitions. We infer from Raila's testimony that she and other solicitors had asked for and received permission to be on Dominick's property. We infer as well that, at such times, Dominick's told solicitors where they might stand so as not to impede normal op-

erations of the store. Even a municipality can set up reasonable restrictions governing the time, place and manner of expressive activity. (*Chicago Park District v. Lyons* (1968), 39 Ill. 2d 584.) A search of the record does not reveal whether defendant asked Dominick's for permission to solicit signatures before he stationed himself within the cart-control area. However, Ted Scanlon, a Dominick's manager, was asked whether he had investigated a problem at Dominick's on the date of the incident. Scanlon testified, "I walked out, and found the man on our property, and asked him to leave." We gather from Scanlon's statement that defendant had neither asked for nor received permission to solicit at Dominick's. Defendant was told that he was on private property and had no right to remain there. Although he insisted that he was on public property, defendant then took evasive action, circling the block to avoid the police. We conclude from these facts and inferences that, despite the lack of any "No Soliciting" signs, Dominick's had not given defendant the impression that its property was public in nature and open to expressive activities. Further, the fact that Dominick's allowed people to leave messages on a bulletin board inside the store does not persuade us that the store was thus transformed into a public forum. A grocery store bulletin board is ordinarily provided as a means for customers to advertise or request services and items for sale. It is not generally a mechanism for the exchange of ideas.

The appellate court held, without prior analysis, that defendant's conviction violated article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). The provision guarantees that no person shall be denied the equal protection of the laws. The essential element of an equal protection claim is that the claimant has been injured by being placed in a position worse than that of some comparable person. (*People v. Natoli* (1979), 70 Ill.

App. 3d 131, 139.) Protection is afforded, however, not simply against inequality, but rather against invidious discrimination. (*Village of Cahokia v. Wright* (1973), 11 Ill. App. 3d 124, 131.) We have found nothing in the record to indicate that Dominick's exclusion of defendant was in any way related either to the content of defendant's petition or to his sex, race or national origin. However, we would be reluctant to consider that apparent lack of discrimination as a factor in our decision concerning private action. If we were to do so, a store owner who consented to place a friend's campaign poster in the store window might then be held obliged to cover his display window with posters advertising every other candidate in the election. As we stated previously, a private owner has the right to use his property for his own purposes. This right is subject only to the police power of the State. (*Hannifin*, 1 Ill. 2d 28.) "The privilege of free speech cannot be used to the exclusion of other constitutional rights nor as an excuse for unlawful activities." *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753* (1939), 371 Ill. 377, 393.

We have adopted an analysis independent of that given cases decided by the Supreme Court under the first and fourteenth amendments. We note, however, that in *Pruneyard*, where the Supreme Court recognized a State's right to provide greater protection than the first amendment to free speech rights in shopping centers, Justice Powell stated in his concurrence:

"I join Parts I—IV on the understanding that our decision is limited to the type of shopping center involved in this case. Significantly different questions would be presented if a State authorized strangers to picket or distribute leaflets in privately owned, freestanding stores and commercial premises. *** Even large establishments may be able to show that the number or type of persons wishing to speak on their premises would create a substantial

annoyance to customers that could be eliminated only by elaborate, expensive, and possibly unenforceable time, place, and manner restrictions. As the Court observes, state power to regulate private property is limited to the adoption of reasonable restrictions that 'do not amount to a taking without just compensation or contravene any other federal constitutional provision.' " *Pruneyard*, 447 U.S. at 96-97, 64 L. Ed. 2d at 761-62, 100 S. Ct. at 2048-49 (Powell, J., concurring in part, joined by White, J.).

Thus, a finding that the State constitution gives greater rights of free expression than the Federal Constitution to persons on the premises of a free-standing private store might well be found unconstitutional by the Supreme Court. However, it is not necessary to anticipate that this court's decision will conflict with Federal law. We conclude that the Dominick's store in this case was not a public or quasi-public establishment, and that consequently its exclusion of defendant did not violate article I, section 4, of the Illinois Constitution.

## FREE AND EQUAL ELECTIONS

The appellate court below rested its decision in part upon article III, section 3, of the Illinois Constitution, which provides that "[a]ll elections shall be free and equal." (Ill. Const. 1970, art. III, §3.) This provision was left unchanged by the Constitutional Convention of 1970. The Constitutional Commentary to the provision reports that the Committee on Suffrage and Constitutional Amendment endorsed, "without reservation," the line of Illinois Supreme Court decisions, which applied the provision:

> " 'to the entire election process, from a candidate's efforts to gain access to the ballot, [citations]; to the people's right to nominate candidates, [citations]; to the freedom of the election process from fraud and voter intimidation, [citations]; to the counting of every properly cast ballot [citation].' " Ill. Ann. Stat., 1970 Const., art.

III, §3, Constitutional Commentary, at 60 (Smith-Hurd 1971).

There has been no previous Illinois case in which a defendant claimed that his rights under the free and equal elections provision were violated by his exclusion from private property. However, the Supreme Judicial Court of Massachusetts addressed the issue in *Batchelder*, where a political petitioner had been excluded from a large shopping center. (*Batchelder*, 388 Mass. 83, 445 N.E.2d 590.) In determining that the petitioner's rights to free elections were violated, the court stated:

> "[A] person needing signatures for ballot access requires personal contact with voters. He or she cannot reasonably obtain them in any other way. Reasonable access to the public is essential in ballot access matters." (*Batchelder*, 388 Mass. at 92, 445 N.E.2d at 595.)

The court then proceeded to weigh the property interests of the mall owner against the petitioner's right to free and equal elections. Because statistics showed that the shopping center was the most favorable area in the district to circulate petitions, the court found that the petitioner's rights outweighed those of the shopping center.

The factual situation in *Batchelder* is different from that in the case before us. *Batchelder* concerned one of the largest shopping centers in the country. The mall occupied the position of a town's central business center. Petitioners would not have had access to the same number of shoppers if they had stood outside the enclosed mall. Here, we have under consideration a single grocery store, where the public sidewalk was adjacent to the private property on which the defendant stood while soliciting signatures. Defendant urges us not to draw an "arbitrary line in the cement." We find no need to do so, as the line between the public sidewalk and Dominick's pavement was visible before defendant entered

Dominick's cart-control area. We believe that defendant would have had sufficient access to shoppers' signatures if he had stationed himself a few steps away, on the public sidewalk.

The appellate court below cites an Oregon case as being almost identical in its facts with the case before us. (*Cargill*, 100 Or. App. 336, 786 P.2d 208.) *Cargill* concerned the rights of a solicitor to gather signatures on a political petition while on private commercial property. However, *Cargill* is distinguishable in two respects. First, the petition circulators stood on the store's private sidewalk, between the private parking lot and the department store's main entrance. There was no adjacent public sidewalk from which the defendants could have solicited shoppers' signatures. Second, the *Cargill* court based its decision on the primacy of the Oregon Constitution's initiative and referendum provisions. The court found that defendants' inability to collect sufficient signatures elsewhere than at the store could prevent several measures from appearing on the ballot. Thus, the court held that the defendants' activities were constitutionally protected.

As we noted previously, defendant in this case could have collected signatures while on the public sidewalk adjacent to Dominick's. Moreover, we are not presented with the concern for initiative and referendum provisions that was critical to the *Cargill* decision. Thus, we find *Cargill* inapplicable to the case at bar.

Moreover, this court has previously stated that the "free and equal" provisions of article III, section 3, of the Illinois Constitution are in effect those of the fourteenth amendment, and call for no more than the Federal Constitution in relation to equal protection. (*Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 71.) The test of the fourteenth amendment is whether the difference in treatment of "individuals is an

invidious discrimination." (*Schilb v. Kuebel* (1971), 404 U.S. 357, 364, 30 L. Ed. 2d 502, 510, 92 S. Ct. 479, 484.) We have found no evidence that Dominick's discriminated against defendant on the basis of his sex, race, national origin, or political preference.

Further, the fourteenth amendment was intended to regulate only conduct by the States or their instrumentalities. (*Shelley*, 334 U.S. at 13, 92 L. Ed. at 1180, 68 S. Ct. at 842.) We have found that there was no direct State action in this case and that Dominick's was not performing the function of a public forum. Acts of a private citizen pursuant to his right to petition are only conditionally privileged, and must be considered in light of the rights of others. (*Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 550-51.) The right to private property is an inherent right (*Meadowmoor*, 371 Ill. at 393) which is protected by the Illinois Constitution (Ill. Const. 1970, art. I, §2). We conclude that defendant's rights under the free and equal elections provisions of the Illinois Constitution were not violated in this case.

For the reasons set out above, we hold that Dominick's use of the criminal trespass to land statute to exclude defendant from its property did not violate defendant's rights under the free speech or the free and equal elections provisions of the Illinois Constitution. Consequently, we reverse the judgment of the appellate court, and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*