STATE of Minnesota, Respondent,

v.

Freeman Algot WICKLUND, et al., petitioners, Appellants.

No. C7–97–1381.

Supreme Court of Minnesota.

March 11, 1999.

---

Larry B. Leventhal, Larry Leventhal & Associates, Minneapolis, for appellants.

Sandra Henkels Johnson, Assoc. Bloomington City Attorney, Bloomington, Mike Hatch, Attorney General State of Minnesota, St. Paul, for respondent.

Randall D.B. Tigue, John M. Sheran, Leonard, Street & Deinard, P.A., amicus curiae, Minneapolis.

## OPINION

STRINGER, Justice.

We granted review to consider whether an anti-fur protest staged in the common area

adjacent to Macy's Department Store inside the Mall of America (MOA) is constitutionally protected speech. We agree with the court of appeals that it is not, and therefore affirm.

The essential facts are not in dispute. Just before noon on Sunday, May 19, 1996, appellants Freeman Algot Wicklund, Althea Ruth Schaffer, Peter Benson Eckholdt, and Allissa Ifetayo Eggert and approximately six others distributed leaflets and carried placards illustrating cruel treatment of animals by the fur trade and urging a boycott of Macy's—a retailer of fur products. The protesters stood inside the MOA in the second-floor courtyard area in front of Macy's as they attempted to engage passers-by in conversation about the ethics of producing and selling fur products. The protest was at all times peaceful and nonconfrontational. The protesters were each warned several times by MOA security guards that they were on private property and that if they continued their activities they would be arrested. Several of the protesters chose to put away their placards and leave, but the four appellants refused to leave and were peacefully arrested by Bloomington police officers and charged with misdemeanor trespass in violation of Minn.Stat. § 609.605, sub. 1(b)(3) (1998).

Appellants moved to dismiss the charges against them claiming they have a "claim of right" which precluded the state from proving the trespass charges. *See State v. Brechon,* 352 N.W.2d 745, 750 (Minn.1984) (state's burden to prove beyond reasonable doubt that defendants had no claim of right). Although appellants initially based their claim of right on the free speech provisions of the First Amendment of the Federal Constitution, at the suggestion of the trial court their primary argument is now that their conduct is protected by Article I, Section 3 of the Minnesota Constitution, which provides that "all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right."

Substantial evidence about the MOA was presented at a pretrial evidentiary hearing, including that the MOA is the largest shop-

ping mall in the United States encompassing 4.2 million square feet of space and attracting 37.5 million visitors annually. Its tenants include four anchor stores, including Macy's, in addition to some 400 other retail establishments, movie theatres and entertainment venues, the nation's largest indoor amusement park, a wedding chapel, a post office, a police substation, and an alternative school. It is promoted as an exciting vacation destination and sponsors promotional events aimed at attracting specific groups of consumers such as senior citizens and families.

Extensive evidence was also presented as to how the MOA was developed. The Bloomington Port Authority (BPA), an economic development agency for the City of Bloomington (City), purchased the site of the old Metropolitan Stadium and solicited proposals for development. The BPA issued approximately $105 million in tax increment financing (TIF) bonds pursuant to Minn.Stat. § 469.178 (1987)—a popular form of financing local developments utilizing increased tax dollars generated by a project to repay the bonds. *See* Richard Briffault, *The Rise of Sublocal Structures in Urban Governance,* 82 Minn. L.Rev. 503, 512 (1997) (outlining development of tax increment financing). The bonds financed the site preparation including utilities, parking ramps, access roads between the MOA and the ramps, and pedestrian bridges linking the ramps to the mall itself. The BPA's current involvement in the MOA is limited to monitoring the bond indebtedness. Its bonds will be repaid by the year 2015 or sooner by "capturing" property taxes paid by the MOA and by a liquor and hotel/motel tax imposed by the City. Construction of the balance of the project was financed by the Mall of America Company, a subsidiary of two privately-owned shopping center development corporations, at a cost of approximately $700 million.

In addition to the BPA TIF financing, the Minnesota legislature enacted legislation giving the City of Bloomington permission to issue $80 million[1] in bond financing to cover

1. The state agreed to repay approximately $60 million of this amount to the city over ten years. Other than this reimbursement, no state funds

were used to finance the MOA. The remaining $20 million for highway improvements was in

the cost of highway reconstruction surrounding the MOA in time for its opening. Roads surrounding the site were already on the state's list of highway improvements but were not scheduled for construction for another eight years. The evidence adduced at the hearing indicated that public financing contributed $186 million of the total development cost of $886 million, or approximately 21% of the total cost of the MOA's development, and will decrease to zero as the bonds are repaid.

The trial court also heard testimony about the MOA's management. The MOA employs 150 full-time security guards to patrol its common areas and assist in individual stores as requested. Their duties include enforcing the MOA's code of conduct for patrons which prohibits, among other things, unauthorized petitioning, handbilling and picketing.[2] If a patron violates the code, the patron is informed by a MOA security guard of the violation and given the choice of conforming to the code or leaving the premises, and is told that if the patron does neither, arrest will follow. It is only then that the Bloomington police are summoned and a citizen's arrest is made by the MOA guard.

The police substation at the MOA consists of a room available for police use in the sub-basement but no staff is assigned to this location. The MOA also hires off-duty police officers to provide contractual police services, including traffic control and heightened security when needed—a service available to any private entity in the City. The off-duty police officers are at all times supervised by the Bloomington Police Department, which in turn is reimbursed for its services by the MOA. Macy's received notice in the form of a national press release that protestors would be targeting its stores on May 19, 1996. Macy's requested contractual police services and six Bloomington police officers were assigned to the location.

Following the evidentiary hearing, the trial court issued a 62–page order in which it accompanied its findings of fact with 57 "General Principles of State Constitutional Construction." The trial court, applying *sua sponte* Minnesota's free speech constitutional protection, concluded that the MOA was public property because the public was generally invited onto the property and public financing was involved in the MOA's development. The court characterized the interior of the MOA "as public as any city thoroughfare, as any government grounds" because it "was born of a union with government." Consequently, appellants' speech would be constitutionally protected, so the trial court concluded, but appellants' failure to "test the Mall's willingness to honor the Constitution" was fatal to their motion to dismiss.

The court of appeals reversed declining to extend state constitutional protection to appellants' speech based on the patent lack of support for the trial court's conclusion that the framers of the Minnesota Constitution intended the state's free speech provision to provide more protection than its federal counterpart, and additionally, on this court's historical reluctance to interpret Article I, Section 3 more expansively than the First Amendment of the Federal Constitution. *State v. Wicklund,* 576 N.W.2d 753, 756–57 (Minn.App.1998). Appellants'. contention that the use of public funds constituted the state action requisite to triggering protection under Article I, Section 3 of the Minnesota Constitution was likewise rejected:

> If the "state action" requirement is discarded, it is difficult to formulate a principled line between those privately-owned locations in which constitutional free speech guarantees should apply and those where they should not. * * * Moreover, a discarding of the "state action" requirement in this area has broad implications for other constitutional provisions to which the "state action" requirement has traditionally been applied.

*Id.* at 758 (citation and footnote omitted). The court of appeals concluded that the free speech protection of Article I, Section 3, of

---

the form of a general obligation bond to be repaid from cash flow interest earnings.

**2.** Those who wish to use the common areas of the mall, including MOA tenants, must apply to the management office for permission. A Community Booth is also available for use, requiring a similar application procedure.

the Minnesota Constitution did not apply to appellants' expressive conduct at the privately-owned MOA. *Id.* at 759.

■ As an initial matter, appellants argue that the standard governing a state's appeal of a pretrial order should be whether the trial court's findings are clearly and unequivocally erroneous. The trial court's conclusions as to application of the Minnesota Constitution's free speech protections are clearly determinations of law however and therefore our standard of review is de novo. *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992).

*I. Constitutional Protection*

A. The Federal Constitution

■ We begin our analysis of whether appellants' speech is protected under the state or federal constitution with consideration of whether it falls within the protection of our Federal Constitution, for if it does, then its status under our state constitution need not be addressed. The relevant portion of the First Amendment of the Federal Constitution provides that "Congress shall make no law * * * abridging the freedom of speech * * *." U.S. Const. amend. I. As applied to the states through the Fourteenth Amendment, it "is a guarantee only against abridgment [of the right of free speech] *by government, federal or state.*" *Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (emphasis added). The abridgment then must involve some form of government action.

An exception to the requirement of government action however, arose in *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), where the United States Supreme Court found the exercise of free speech protected in the business block of a company-owned town. *Id.* at 509, 66 S.Ct. 276. The town was indistinguishable from any other municipality in appearance, function or accessibility, but there was one crucial difference—the company owned the entire town and had taken over all municipal functions. *Id.* at 507–08, 66 S.Ct. 276. Under these circumstances, the Court held the residents' right to free speech "occup[ies] a preferred position" against the property rights

of the company. *Id.* at 508–09, 66 S.Ct. 276. *Marsh* had a short life span however. It was only briefly expanded in *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), when the Supreme Court held that a shopping mall was the functional equivalent of the privately owned business block in *Marsh,* and that peaceful picketing targeting a single store and carried on in the privately owned parking lot adjacent to the mall was protected by the First Amendment. *Id.* at. 324. But Justice White's dissent began the whittling back of the breadth of *Marsh:*

> [T]he company town [in *Marsh* ] was found to have all of the attributes of a state-created municipality and the company was found effectively to be exercising official power as a delegate of the State. In the context of that case, the streets of the company town were as available and as dedicated to public purposes as the streets of an ordinary town. The company owner stood in the shoes of the State in attempting to prevent the streets from being used as public streets are normally used. The situation here is starkly different. * * * Logan Valley Plaza is not a town but only a collection of stores. In no sense are any parts of the shopping center dedicated to the public for general purposes or the occupants of the Plaza exercising official powers. The public is invited to the premises but only in order to do business with those who maintain establishments there. The invitation is to shop for the products which are sold.

*Logan Valley,* 391 U.S. at 337–338, 88 S.Ct. 1601 (White, J., dissenting).

■ Four years later in *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), the Supreme Court adopted the logic of Justice White's dissent and rejected the argument that a shopping mall was the equivalent of a company town:

> Respondents contend * * * that the property of a large shopping center is "open to the public," serves the same purposes as a "business district" of a municipality, and therefore has been dedicated to certain types of public use. [* * *] It is then

asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh v. Alabama * * *,* involved the assumption by a private enterprise of *all of the attributes of a state-created municipality * * *.* In the instant case there is no comparable assumption or exercise of municipal functions or powers.

Nor does property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center.

*Id.* at 568–69, 92 S.Ct. 2219 (emphasis added). Two years later, the Court put to rest any notion that its holding in *Logan Valley* was still viable when it held that "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case" and that the holding in *Lloyd* was a total rejection of the *Logan Valley* doctrine. *Hudgens,* 424 U.S. at 518, 96 S.Ct. 1029.[3] The clear state of the law then is that property is not somehow converted from private to public for free speech purposes because it is openly accessible to the public. Appellants' argument that the MOA is a "fully controlled enclosed environment" like the company town in *Marsh* was rejected in *Lloyd.* It is now beyond debate that under the circumstances here,

appellants' speech is not protected under the First Amendment.

### B. The Minnesota Constitution

Even though First Amendment protection for expressive behavior on private property is unavailable to appellants however, the states may apply their own constitutional protection more expansively as long as the restrictions on private property "do not amount to a taking without just compensation or contravene any other federal constitutional provision." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The Supreme Court ruled that the federal rights of the property owners were adequately protected through the permitted use of reasonable time, place and manner regulations. *Id.* at 83, 88, 100 S.Ct. 2035.

■ We have long recognized that we may articulate independent and more protective standards under our state constitution than are accorded under comparable provisions of the Federal Constitution. *See State v. Oman,* 261 Minn. 10, 21, 110 N.W.2d 514, 522–23 (1961) (Minnesota's due process standard may be developed independent of federal law); *Matter of the Welfare of E.D.J.,* 502 N.W.2d 779, 783 (Minn.1993) (declining to lower Minnesota's standards for searches and seizures to federal level); *State v. Russell,* 477 N.W.2d 886, 889 (Minn.1991) (equal protection analysis under Minnesota law more stringent than federal law); *State v. Hershberger,* 462 N.W.2d 393, 397–98 (Minn. 1990) (greater religious liberties under state law than under federal law); *State v. Hamm,* 423 N.W.2d 379, 380–81 (Minn.1988) (12-member jury required under state but not federal law).

■ Our first consideration therefore is to inquire whether the significant difference in terminology between the federal and state free speech provisions suggests that the framers of the Minnesota Constitution intended the free speech protection to be more

---

**3.** In *State v. Miller,* 280 Minn. 566, 159 N.W.2d 895 (1968), the Minnesota Supreme Court applied federal law and held in a two paragraph decision that the distribution of political pamphlets in a shopping center was protected speech under the recently decided *Logan Valley.* 280 Minn. at 567, 159 N.W.2d at 896. Although appellants cite this case, it is no longer good law following *Lloyd* and *Hudgens. State v. Scholberg,* 412 N.W.2d 339, 343 (Minn.App.1987), *rev. denied* (Minn. Nov. 13, 1987).

broadly applied than its federal counterpart. The Federal Constitution prohibits Congress from passing laws "abridging the freedom of speech * * *." U.S. Const. amend. I. The Minnesota Constitution provides that "all persons may freely speak * * * on all subjects, being responsible for the abuse of such right." Minn. Const. art. I, § 3. A brief historical journey compels the conclusion that the inference cannot be drawn that our framers intended a more expansive application.

The published discussions on the free speech provision at the 1857 Minnesota constitutional conventions—there were two conventions because Republican and Democratic delegates refused to meet jointly—make it clear that delegates from both parties were primarily concerned with the constitutional treatment of libel suits[4] and the delegates' intent regarding the scope of protection for speech is, at best, unclear. It is far easier to support the conclusion that the language of Article I, Section 3 was copied from elsewhere, an assumption which is supported by repeated references to the provisions of other constitutions by the delegates. For example:

Mr. Wilson: The first Constitution in this book of Constitutions, which I hold in my hand, has in it such a [free speech] provision as we contemplate; and the last has it also, and it runs through most of them.

Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota 94 (T. Andrews, rep., St. Paul 1858).

As the court of appeals appropriately noted, the language of Article I, Section 3 is not unique. *Wicklund,* 576 N.W.2d at 756. In fact, the state constitutions of 33 other states contain language nearly identical to our own. *Id.* at 756. The majority of courts having virtually identical language have interpreted the free speech provisions of their constitutions as coextensive with that of the First Amendment.[5] Finding nothing from either the 1857 debates or decisions of other states having similar or identical provisions to suggest that our state's free speech protection was intended to be applied more broadly than its federal counterpart, we conclude that there is nothing inherent in the language of Article I, Section 3 which requires more expansive protection for free speech than does the First Amendment.

■ Our next question then is even if the history or language of Article I, Section 3 doesn't suggest a broader state application as we have concluded, is there sound reason to do so. Mere preference for a different outcome is not enough. We have characterized it as "a significant undertaking for any state court to hold that a state constitution offers broader protection than similar federal provisions, and it is certainly not sufficient 'to reject a [U.S.] Supreme Court opinion on the comparable federal clause merely because one prefers the opposite result.' " *Women of the State of Minn. by Doe v. Gomez,* 542 N.W.2d 17, 30 (Minn.1995) (quoting Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights,* 9 U.Balt.L.Rev. 379, 392 (1980)). In *Women of Minnesota,* we extended the right of privacy to cover the right to abortion funding for those on public assistance—a protection not available under federal law,[6] but one we determined should

4. *See* Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota 89–97 (T. Andrews, rep., St. Paul 1858); The Debates and Proceedings of the Minnesota Constitutional Convention 282–88 (F. Smith, rep., St. Paul 1857).

5. *See, e.g., Fiesta Mall Venture v. Mecham Recall Committee,* 159 Ariz. 371, 767 P.2d 719, 723 (1988); *Citizens for Ethical Government, Inc. v. Gwinnett Place Assocs.,* 260 Ga. 245, 392 S.E.2d 8, 9–10 (1990); *Illinois v. DiGuida,* 152 Ill.2d 104, 178 Ill.Dec. 80, 604 N.E.2d 336, 344–45 (1992); *State v. Lacey,* 465 N.W.2d 537, 540 (Iowa 1991); *Woodland v. Michigan Citizen's Lobby,* 423 Mich. 188, 378 N.W.2d 337, 347 (1985); *SHAD Alliance v. Smith Haven Mall,* 66

N.Y.2d 496, 498 N.Y.S.2d 99, 488 N.E.2d 1211, 1215 (1985); *State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708, 712 (1981); *Eastwood Mall Inc. v. Slanco,* 68 Ohio St.3d 221, 626 N.E.2d 59, 61 (1994); *Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331, 1339 (1986); *Charleston Joint Venture v. McPherson,* 308 S.C. 145, 417 S.E.2d 544, 548 (1992); *Southcenter Joint Venture v. National Democratic Policy Comm.,* 113 Wash.2d 413, 780 P.2d 1282, 1291 (1989); *Jacobs v. Major,* 139 Wis.2d 492, 407 N.W.2d 832, 836–37 (1987).

6. *See Harris v. McRae,* 448 U.S. 297, 310, 100 S.Ct. 2701, 65 L.Ed.2d 784 (1980).

be accorded in Minnesota because of this state's "long tradition of affording persons on the periphery of society a greater measure of government protection and support than may be available elsewhere." *Id.* at 30. We have also extended the right to counsel under the Minnesota Constitution beyond that required under federal law based on this state's long tradition of expansive protection of fair trial rights. *Friedman v. Comm'r of Pub. Safety,* 473 N.W.2d 828, 831–32 (Minn.1991).

In the areas of commercial speech, obscenity, and freedom of the press, we have interpreted Article I, Section 3 of the Minnesota Constitution more restrictively. In *State by Spannaus v. Century Camera, Inc.,* 309 N.W.2d 735 (Minn.1981), we considered whether a state statute prohibiting employers from requiring their employees to submit to polygraph and other tests purporting to evaluate the employee's honesty was unconstitutionally overbroad or vague under both the Federal Constitution and Article I, Section 3 of the Minnesota Constitution. *Id.* at 737–38. We analyzed the statute under federal standards and held that "[t]he protection of freedom of speech guaranteed by Minn. Const. art. I, § 3 is no more extensive in this case than the protection provided by the first amendment to the United States Constitution." *Id.* at 738 n. 6. We held that the statute was neither vague nor overbroad under the federal standard for commercial speech. *Id.* at 740–44. Similarly in *State by Humphrey v. Casino Marketing Group, Inc.,* 491 N.W.2d 882 (Minn.1992), we held that a statute regulating telephone calls made by automated equipment withstood state constitutional scrutiny since "we are in general accord with the United States Supreme Court's declination to extend the full force of free speech protection to commercial speech." *Id.* at 885 n. 2.

We have also declined to extend state constitutional protection to obscene speech beyond that offered by the First Amendment:

The [U.S.] Supreme Court has held that obscenity is not protected speech. * * * We see no reason to apply our constitution differently. Accordingly we hold that while art. I, § 3 of the Minnesota Constitution may offer broader protection than

the federal first amendment, such protection does not extend to obscenity.

*State v. Davidson,* 481 N.W.2d 51, 57 (Minn. 1992) (citation and footnote omitted); *see also Knudtson v. City of Coates,* 519 N.W.2d 166, 169 (Minn.1994) (holding city prohibition on nude dancing in bars did not violate Minn. Const. art. I, § 3).

In *Cohen v. Cowles Media Co.,* 479 N.W.2d 387 (Minn.1992), we considered whether freedom of the press under Article I, Section 3 should be more expansively protected than under the Federal Constitution. *Id.* at 390. We declined to do so, holding that the differences in language between the free press protections of the Minnesota Constitution and the Federal Constitution were insufficient to warrant expanded protection. *Id.* at 390–91. Likewise in *State v. Turner,* 550 N.W.2d 622 (Minn.1996), we applied the Supreme Court's analysis in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), under the Federal Constitution to reject the argument that a newspaper photographer who witnessed criminal activity enjoyed a state constitutional privilege to refuse to testify at trial. *Turner* at 628.

As we previously noted, rulings from other jurisdictions hold that most of the free speech provisions of other state constitutions are applied to provide no broader protection than that offered by the First Amendment. Many of these state rulings follow the logic of the Connecticut Supreme Court when it declined to extend the state's constitutional protections to a political advocacy group attempting to distribute literature and solicit signatures in a regional shopping mall. *Cologne v. Westfarms Assocs.,* 192 Conn. 48, 469 A.2d 1201, 1209 (1984). The court found no legal basis for distinguishing shopping centers from other places where large numbers of people congregate such as stadiums, convention centers, theatres, and other large buildings. *Id.*

The small minority of state courts interpreting their constitutions to offer broader protection for speech in shopping malls do so only under very limited conditions, and usually under the cloak of another constitutional provision. Massachusetts, for example, ex-

tends state constitutional protections to the solicitation of signatures in large shopping malls, but the right is limited to "ballot access and not with any claim of right to exercise free speech rights apart from the question of ballot access." *Batchelder v. Allied Stores International, Inc.*, 388 Mass. 83, 445 N.E.2d 590, 595 (1983). California bases its protection of speech inside privately owned shopping malls on two state constitutional provisions—the right to free speech and the right to petition. *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 153 Cal. Rptr. 854, 592 P.2d 341, 347 (1979), *aff'd* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Oregon limits state constitutional protection to persons seeking signatures on initiative petitions in common areas of large shopping centers. *Lloyd Corp., Ltd. v. Whiffen*, 315 Or. 500, 849 P.2d 446, 454 (1993). Protection extended under the New Jersey constitution is limited to "leafletting and associate speech in support of, or in opposition to causes, candidates, and parties." *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757, 781 (1994).

Absent here is any rationale for the "significant undertaking" we identified in *Women of Minnesota* to compel a conclusion that our state constitution free speech protection should be more broadly applied than its federal counterpart. There is no historical basis for making such a distinction nor do we consider in today's balance of free speech versus property rights that free speech should have any more exalted a position than is accorded it under our Federal Constitution. Appellants' speech was directed at persuading shoppers to forgo buying fur products and to boycott Macy's in an attempt to effect change in the retail and fur industries. Its purpose was not to achieve some political goal such as a ballot initiative—it is best characterized as protest speech, intended to be provocative. We decline to extend the free speech protections of Article I, Section 3 of the Minnesota Constitution beyond those protections offered by the First Amendment.

## II. State Action

■ Finally, appellants argue that the Mall of America was "born of a union with government" and should be considered a state actor because public financing was used to develop the MOA and because of the "public nature" of the mall's interior—therefore the state's constitutional protections against state action are implicated.

■ More than a century ago we held that the protections of our state constitution are triggered only by state action. *See State ex rel. Childs v. Sutton*, 63 Minn. 147, 150, 65 N.W. 262, 263 (1895) ("[The Minnesota Constitution] stands, not only as the will of the sovereign power, but as security for private rights, and as a barrier against legislative invasion."). The Minnesota Constitution does not accord affirmative rights to citizens against each other; its provisions are triggered only by state action. *Id.*

In the context of the federal constitution however, we have held that "if the conduct that is formally private has become so entwined with governmental character as to become subject to the constitutional limitations placed upon state action," federal constitutional restrictions on conduct may be applied against private entities. *Brennan v. Minneapolis Society for the Blind, Inc.*, 282 N.W.2d 515, 524 (Minn.1979). In *Brennan*, we looked to *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), for guiding principles as to where and when state action could be found and determined that a private foundation receiving significant funding [7] from public sources was not a state actor under either a sufficiently close nexus test or a symbiotic relationship test. *Brennan*, 282 N.W.2d at 525. Although we found "extensive interaction through funding, referrals, and regulation, and a high level of interdependence arising from the specialized nature and limited availability of the services," we held that "more is required to constitute state action than the involvement of state funds or state regulations." *Id.* at 526–27. We stated:

---

7. The private foundation received between 11 and 23% of its gross revenue from programs services fees paid by the state, and received additional grant money for specific projects for which up to 80% of the cost could be paid by public funds. *Id.* at 518.

The facts alleged to constitute a symbiosis must indeed convince us that *the "power, property, and prestige" of the state has been in fact placed behind the discriminatory conduct.* Burton [365 U.S. at 725, 81 S.Ct. 856]. We are not so convinced by the case before us.

*Id.* at 528 (emphasis added).

The trial court here was persuaded that the sheer amount of public financing involved in the development of the MOA made consideration of a threshold level of public involvement unnecessary. We disagree. The court of appeals noted well the flaw in the trial court's reasoning:

> We are aware also of the uncertainties created by the trial court's application of free speech rights to an undetermined class of properties that are privately-owned but publicly-funded, at least in part. *If the "state action" requirement is discarded, it is difficult to formulate a principled line between those privately-owned locations in which constitutional free speech guarantees should apply and those where they should not.*

*Wicklund,* 576 N.W.2d at 758 (emphasis added). It is conceivable under our *Brennan* analysis that state action could be found in a project having no public funding at all, and conversely, a project funded entirely by public financing may not sufficiently entangle the "power, property and prestige" of the government to create state action. Here, the amount of public financing of the MOA differs only in scale from that found in any other TIF project. The proportion of public financing is less for the MOA than that in *Brennan,* and unlike the continuous stream of state-funded program fees and grants found in that case, the proportion of TIF financing here decreases as the bonds are repaid.

Nor is there any of the abrogation of governmental functions to a private entity implicit in *Brennan* to trigger constitutional scrutiny. The MOA is managed by a private company. It pays for its public services—police, utilities, fire, security—in the same manner as any other private business in Bloomington. It is patrolled by private security guards, not by police officers. The MOA leases space for a post office and alternative school, but there is no evidence of any entanglement between any governmental function and MOA management in connection with these tenants. The lack of evidence connecting the "power, property and prestige" of the State of Minnesota or the City of Bloomington with the actions of MOA management compellingly persuades us that there is neither sufficient nexus nor symbiosis to establish that the MOA is the alter ego of a governmental entity.[8]

We likewise find it unpersuasive that the public is "invited" to the MOA. As Justice White observed in his *Logan Valley* dissent, a shopping mall's purpose is to entice its patrons to come to the mall and spend money. While the public is invited to many privately-owned places to shop, dine, or be entertained, the invitation creates only a license which may be revoked, as it was here.

We conclude that under the circumstances here neither the presence of public financing alone nor the public financing coupled with an invitation to the public to come onto the property is sufficient to transform privately-owned property into public property for purposes of state action. We adhere instead to the balancing tests outlined in *Brennan,* allowing state action to be found only where there is either a symbiotic relationship or a sufficiently close nexus between the government and the private entity so that the "power, property and prestige" of the state has been in fact placed behind the challenged conduct. *Brennan,* 282 N.W.2d at 528.

---

**8.** Appellants point to the Colorado Supreme Court decision in *Bock v. Westminster Mall Co.,* 819 P.2d 55 (Colo.1991), where the court considered the impact of public financing of a shopping mall, the presence of a police substation and other government agencies, the patrol of the mall by police during business hours, and the "public nature" of the mall sufficient to establish state action for purposes of the free speech protections offered by the Colorado Constitution. *Id.* at 62–63. While *Bock* is distinguishable on the basis that the activity in the Colorado mall was far more of a governmental nature, we simply disagree that the circumstance there would, under the Minnesota Constitution, rise to the level that the power, property and prestige of the state would implicate the state as the responsible actor.

We hold that Article I, Section 3 of the Minnesota Constitution does not, under the circumstances here, offer greater protection to speech than the First Amendment, nor does public access to the MOA or public financing transform the nature of its property from private to public for purposes of free speech protection under the state constitution. We therefore affirm the court of appeals.

Affirmed and remanded for trial.

LANCASTER, J., took no part in the consideration or decision of this case.