#23733-a-JKM

**2006 SD 109**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

HELEN GILBERT,                                          Plaintiff and Appellant,

v.

FLANDREAU SANTEE SIOUX TRIBE,                  Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

* * * *

HONORABLE DAVID R. GIENAPP
Judge

* * * *

TODD D. EPP of
Todd D. Epp Law Office, PLLC                    Attorney for plaintiff
Harrisburg, South Dakota                            and appellant.

ROLLYN H. SAMP of
Samp Law Firm                                          Attorney for defendant
Sioux Falls, South Dakota                            and appellee.

* * * *

ARGUED ON OCTOBER 4, 2006

OPINION FILED **11/29/06**

#23733

MEIERHENRY, Justice

[¶1.]     Gilbert was denied unemployment insurance (UI) benefits after a referee determined she had been terminated for work-related misconduct under SDCL 61-6-14.1.  Gilbert claimed the South Dakota Department of Labor Unemployment Insurance Division's (Department) denial violated her state and federal constitutional rights of free speech.  The circuit court affirmed the denial and Gilbert appeals.  We affirm.

## FACTS

[¶2.]     Helen Gilbert (Gilbert) was employed by the Flandreau Santee Sioux Tribe (Tribe) as an education coordinator from November 13, 2000 to August 10, 2004.  Gilbert supervised a federal wellness program for grades 7-12.  Gilbert's discharge was based on a letter she wrote to the Tribal Executive Committee in reference to the committee's political appointment of Donalda "Neldie" Montoya (Montoya) to the Office of Tribal Secretary, an office also sought by Gilbert.  The letter sharply criticized Montoya's appointment.  Gilbert's complaint about Montoya stemmed from an earlier incident concerning defamatory statements Montoya allegedly had made about Gilbert.

[¶3.]     After learning of Montoya's appointment and before writing the letter, Gilbert telephoned Montoya.  In the phone call, Gilbert told Montoya that she was going to "sue her for slander for the statement she made in May, and that she should write this conversation date and time down and let. . . her supervisor know."

[¶4.]     After the phone call, Gilbert wrote a letter during work hours on tribal stationery to the Tribal Executive Committee.  The heading of the letter indicated

that it was to the Flandreau Santee Sioux Tribe from Helen Gilbert, education

coordinator, in reference to "8/10/04 Incident-Neldie Montoya appointment as FSST

Secretary." The letter began with the following paragraph:

> I received a phone call at approximately 2:00 pm on 8/10/04 from an employee who stated that they were just told that Neldie Montoya has just been appointed as Secretary for the tribe. Neldie, during the election petition process had stated to Elizabeth Shortman that the Council was going to block my nomination based on allegations that I was charged as a prostitute. The knowingly false charge such as this sent me over the edge. I have never received any follow up after I complained about Neldie's statement.

Additionally, the letter criticized the tribal chairman of neglect of duty as follows:

> [He is] unwilling and neglectful in upholding the duties of Tribal Chair by not managing the problems that fall within the purview of his office. Problem employees literally get away with murder, employees who are vocal and know their rights are persecuted.

She then went on to name several other employees who she thought were problem

employees and pointedly accused the employees of such things as "violent,

hysterical public performances," "violence in the workplace," "violation of the

political activity policy," "embezzlement," drug and alcohol violations, and

incompetence.

[¶5.]     Before sending the letter, Gilbert had her supervisor review it. When

asked whether her supervisor okayed the letter, Gilbert stated, "her only reaction or

statement was, 'oh my God, Helen,' that was it." As a result of sending the letter to

the executive committee, the Tribe decided to suspend Gilbert for violating the

political activity policy.[1]  Gilbert was admittedly aware of the policy but felt that writing the letter was within the parameters of her employment and refused to accept the suspension order.  The Tribe subsequently terminated Gilbert's employment.

[¶6.]        As a result, Gilbert filed for UI benefits with the Department on September 2, 2004.  The Department initially determined that the conditions of Gilbert's termination did not disqualify her from receiving UI benefits.  The Tribe appealed the Department's determination.

[¶7.]        Gilbert claimed that she wrote the letter to the tribal council in her capacity as education coordinator and followed the chain of command before submitting it.  After a hearing on the matter, the referee denied Gilbert UI benefits based on a finding that she had been discharged for work-connected misconduct as defined by SDCL 61-6-14.1.[2]  The referee specifically found that Gilbert was aware

---

1.     The Tribe instituted the political activity policy because of a compact the Tribe entered into with the State of South Dakota on gambling which also prohibits the Tribe and its employees from engaging in political activity.

2.     Misconduct is defined by SDCL 61-6-14.1 as:

   1. Failure to obey orders, rules or instructions, or failure to discharge the duties for which an individual was employed; or
   2. Substantial disregard of the employer's interest or of the employee's duties and obligations to the employer; or
   3. Conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of the employee; or
   4. Carelessness or negligence of such degree or recurrence as to manifest equal culpability or wrongful intent.
   However, mere inefficiency, unsatisfactory conduct, failure to perform as the result of inability or incapacity, a good faith error in judgment

(continued . . .)

of the Tribe's political policy, that she wrote a letter to the executive committee on tribal stationary while she was at work, that the letter was critical of the tribal chairman and other tribal employees and that her conduct violated the Tribe's political activity policy. Gilbert appealed the referee's decision to circuit court.

[¶8.] On appeal, Gilbert did not claim that the referee's findings were clearly erroneous. Gilbert's only contention was that she could not be denied UI benefits based upon work-connected misconduct, i.e. violation of the political activity policy, because of her constitutional right to freedom of speech. The circuit court noted that the basic facts were not in dispute, that there was no question that Gilbert's letter violated the political activity policy and that she violated the policy during working hours utilizing tribal stationery. The circuit court affirmed the referee's decision and concluded that there was no violation of Gilbert's constitutional right to freedom of speech. Gilbert appeals the decision claiming that her letter to the tribal council is constitutionally protected free speech for which she cannot be disqualified from receiving UI benefits.

## DECISION

[¶9.] The Tribe's reason for dismissing Gilbert was that the letter she wrote to the Tribe allegedly violated its political activity policy.[3] Gilbert does not dispute

---

(. . . continued)

> or discretion, or conduct mandated by a religious belief which belief cannot be reasonably accommodated by the employer is not misconduct.

3. The Tribe's political activity policy reads as follows:

(continued . . .)

that she wrote the letter on tribal stationery during work hours using tribal equipment. In fact, she does not appear to dispute the referee's and trial court's conclusions that her actions and complaints violated the Tribe's policy. Consequently, the only issue before us is whether her federal or state constitutional right to freedom of speech protects her from being denied UI benefits.

[¶10.] This Court has never analyzed the First Amendment right to free speech in the context of a state's denial of UI benefits. The United States Supreme Court has, however, recognized that the First Amendment protects religious freedom in the context of UI benefits. In *Sherbert v. Verner*, the Court found that a claimant's refusal to work on her faith's Sabbath day was protected and could not serve as a basis for denying UI benefits. 374 US 398, 403-04, 83 SCt 1790, 1793-94,

_____

(. . . continued)

> The tribal administration must be able to operate as fairly and effectively as possible and to protect the rights of its employees by ensuring that they are free from political influence and are able to administer programs without bias or favoritism. It is therefore the policy of the Tribe that employees not engage in political activities during work hours. Employees are strictly prohibited from engaging in political activity during work hours or from using tribal equipment or property for political activity as defined below. Employee shall not be subject to influence or pressure from Executive Committee members or candidates for office.

> Political activity includes, but is not necessarily limited to, the following: preparing, circulating, signing, or soliciting signatures to petition for recall, referendum or initiative, enrollment petitions, election petitions or any other petition involving tribal matters or affairs; any activity intended to influence the out-come of a tribal election or a vote on a matter involving tribal affairs, whether verbal or written, that is intended to be divisive towards the tribal government.

> Violation of this policy will result in disciplinary action, up to and including termination.

10 LEd2d 965 (1963). Additionally, the Court has long recognized a public employee's protection of freedom of speech in cases of discharge from employment. As recently stated in *Garcetti v. Ceballos*, "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" 126 SCt 1951, 1955, 164 LEd2d 689 (2006) (quoting Connick v. Myers, 461 US 138, 142, 103 SCt 1684, 1687, 75 LEd2d 708 (1983)). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id*. Thus in determining whether Gilbert can be denied UI benefits, we follow the method of inquiry set forth by the United States Supreme Court. The Court identifies two inquiries that guide a constitutional analysis as follows:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Id*. (citing Pickering v. Board of Ed. of Tp. High School Dist. Will. Co., Ill., 205, 391 US 563, 568, 88 SCt 1731, 20 LEd2d 811 (1968) and *Connick*, 461 US at 147, 103 SCt at 1690).

[¶11.] Accordingly, our first inquiry is whether Gilbert spoke "as a citizen on a matter of public concern." *Id.*; *see also* Rankin v. McPherson, 483 US 378, 384, 107 SCt 2891, 2897, 97 LEd2d 315 (1987); State v. Springer-Ertl, 2000 SD 56, ¶¶16-17, 610 NW2d 768, 773. The employee bears the initial burden of demonstrating that the speech involves matters of public concern. *See Connick,* 461 US 138, 103 SCt 1684. The United States Supreme Court defined public concern "as relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 SCt at 1690. In evaluating whether statements are a matter of public concern, we look to their content, form, and context, as revealed by the entire record. Rankin v. McPherson, 483 US 378, 385, 187 SCt 2891, 2897, 97 LEd2d 315 (1987). An employee acting "as a concerned citizen interested in bringing problems to light more likely raises a matter of public concern than one who attempts to rectify workplace problems." Wilson v. Washington, 929 P2d 448, 454 (Wash 1996). Statements concerning internal grievances are an example of such attempts to rectify workplace problems and are not generally considered matters of public concern. *See Connick,* 461 US at 147-48, 103 SCt at 1690-91. Likewise, an employee that offers his or her personal opinions or beliefs, especially in the work setting, does not implicate matters of public concern. *Wilson,* 929 P2d at 454; *see also* Koch v. City of Hutchinson, 847 F2d 1436, 1446-47 (10thCir 1988) cert. denied, 488 US 909, 109 SCt 262, 102 LE2d 250 (1988); Keating v. University of South Dakota, 386 FSupp2d 1096, 1107 (DSD 2005). We cannot "presume that all matters which transpire within a government office are of a public concern. . . [because] every remark - and certainly every criticism directed at a public official- would plant the seed of a

constitutional case." *Connick*, 461 US at 149, 103 SCt at 1691. Instead, the content, context and form of the letter determine whether the speech addresses a matter of public concern thereby implicating the First Amendment.

[¶12.]    In *Connick v. Myers*, the United States Supreme Court found that a questionnaire distributed by an assistant district attorney during work hours to other assistant district attorneys containing questions about office transfer policy, office morale, the need for a grievance committee, and the level of confidence in supervisors did not address a matter of public concern. *Id*. at 148, 103 SCt at 1690 (finding, however, that the question of whether employees felt pressured to work in political campaigns was a matter of public concern). Although the dispute with her supervisor centered on office transfer policy, the Court viewed many of the additional issues addressed by the questionnaire as mere extensions of that dispute. *Id*. The fact that the employee dispersed these questionnaires during work hours because she was upset over her recent transfer led the Court to determine that her concerns were simply "one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre." *Id*. at 148, 103 SCt at 1691.

[¶13.]    Gilbert claims in her response letter to the Department that she wrote the letter to the tribal council in her "capacity as education coordinator." In *Garcetti v. Cebellos*, the United States Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 126 SCt at 1960. While Gilbert's official duties as education coordinator did not require her to criticize the tribal chairman or her fellow employees, she claims that her position as education

coordinator gave her the authority to make such a critique. While not dispositive, this fact is relevant to the context and content of Gilbert's letter. *See id*. at 1959. Gilbert also indicated that the context of the letter involved her complaint about Montoya's alleged statement about her and Montoya's recent appointment as secretary to the tribal council. Gilbert explained her motive in her reply letter to the Department:

> In May of 2004, prior to run-off elections for the tribe, it was reported to me that Donalda Montoya, Payroll Clerk, made a statement to an employee at the Clinic, that she was told by a member of Council that if I decided to run for election for a position on Council that my nominating petition would be thrown out due to my conviction as a prostitute. This statement was made on company time, was vicious, untrue and malicious slander. I reported the incident to my supervisor and expected Donalda to be disciplined. I later found that nothing was done, by my supervisor or HR, Deb Wakeman on my behalf.

Nothing in her explanation to the Department or in her testimony indicated that she was speaking as a citizen on a matter of public concern. In fact, she claimed to be speaking in her capacity as education coordinator.

[¶14.] Additionally, the content and form of Gilbert's letter involved internal complaints about other employees and particularly the political appointment of Montoya as tribal secretary. Gilbert addressed these internal complaints to the Tribe's executive committee. Although the internal nature of her letter is not dispositive, when coupled with the nature of her complaints, we conclude that when Gilbert wrote the letter, she was not speaking as a citizen on matters of public concern. *See id.*

[¶15.] Thus considering the context, content and form of Gilbert's letter, we cannot say that the trial court erred when it concluded that the letter did not

contain matters of public concern. Since Gilbert's statements were not of public concern, the First Amendment of the United States Constitution is not applicable and our inquiry ends.

*Violation of Gilbert's Right to Free Speech Under Article VI, Section 5 of the South Dakota Constitution*

[¶16.]	Gilbert contends that Article VI, Section 5 of South Dakota's Constitution provides broader protection than the United States Constitution's First Amendment.[4]  Based on this contention, Gilbert argues that the Department's denial of UI benefits violated her right to freedom of speech under South Dakota's Constitution.  While we have held that the press is afforded no greater rights under Article VI, Section 5, the facts before us present a matter of first impression.  *See* Rapid City Journal Co. v. Circuit Court of the Seventh Judicial Circuit, 283 NW2d 563, 568 (SD 1979) (considering the right afforded to members of the press to access jury voir dire proceedings).

[¶17.]	In considering whether to apply a broader interpretation of our state constitution, we consider the text, history, and purpose of the constitutional provision.  State v. Schwartz, 2004 SD 123, ¶57, 689 NW2d 430, 445 (Konenkamp, J., concurring).  In doing so, we are not bound to reach the same result as the United States Supreme Court finds in the Federal Constitution.  *See* City of

---

4.	In its entirety, Article VI, Section 5 of South Dakota's Constitution provides:

> Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.  In all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.  The jury shall have the right to determine the fact and the law under the direction of the court.

Mesquite v. Aladdin's Castle, Inc., 455 US 283, 293, 102 SCt 1070, 1077, 71 LEd2d 152 (1982). The provisions of South Dakota's Constitution have legal force apart from the federal constitution. *Schwartz*, 2004 SD 123, ¶33, 689 NW2d 430, 438 (Konenkamp, J., concurring).

[¶18.] The best argument for interpreting our State Constitution differently from the Federal Constitution is that the texts of the parallel provisions are different. The relevant portion of Article VI, Section 5 reads as follows:

> Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

The federal counterpart to Article VI, Section 5, the First Amendment to the United States Constitution, reads:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

US Const amend I. Although worded differently, both provisions guarantee freedom of speech and the press. However, it is not clear whether this difference in language was intended to provide broader protection under South Dakota's Constitution.

[¶19.] Article VI, Section 5 of South Dakota's Constitution originated at South Dakota's Constitutional Convention of 1885. On September 14, 1885, the committee on the Bill of Rights submitted a draft of the Bill of Rights to the convention. The proposed language of Article VI, Section 5 mirrored the language in South Dakota's Constitution, which was adopted on October 1, 1889 by popular vote. Article VI, Section 5 remains the same today.

[¶20.]      On September 17, 1885, the Convention discussed a report on the Bill

of Rights and addressed each provision of South Dakota's Bill of Rights individually.

However, the original manuscript of the discussions regarding Article VI, Section 5

was lost and could not be included in the published debates.[5]  This unfortunately

gives us no insight into the thoughts and reasoning of the individuals who debated

Section 5 of South Dakota's Bill of Rights.

[¶21.]      Despite the absence of this particular debate, it is clear that whatever

debate took place regarding Section 5, there were no changes made to the language

of Section 5 proposed by the committee on September 14, 1885.  We also note that

the manuscripts of the debates regarding other provisions in the Bill of Rights

centered on the language of similar guarantees found in other state's constitutions

at that time.[6]  Therefore, we find no indication that the framers intended to provide

more expansive protection through South Dakota's Bill of Rights than that provided

by the First Amendment of the United States Constitution.

[¶22.]      It is also evident that other states' constitutions played a role in the

drafting of South Dakota's Bill of Rights since the majority of states have free

speech provisions similar to that of South Dakota.  In the early part of the twentieth

century, this Court noted that nearly all of the American states had adopted a

---

5.    In volume one, page 281, of South Dakota's Constitutional Debates, there is a
      note from the Editor that reads:  "A page of the original manuscript of the
      debates has evidently been lost at this point, covering the consideration of
      Sections 2, 3, 4 and 5, of the bill of rights."

6.    When a comparison was made, it was usually with the constitutions of
      California, Illinois, or Iowa.

similarly worded free speech amendment.  State v. Kirby, 36 SD 188, 154 NW 284, 286 (1915); *see also* American Bush v. City of South Salt Lake, 140 P3d 1235, 1247 (Utah 2006)(noting that "[a]s of the year 2000, 43 state constitutions contained the 'freedom of speech' tempered by a 'responsibility for abuse' clause."); State v. Wicklund, 589 NW2d 793, 799 (Minn 1999) (noting that 33 states' free speech provisions contained the following language:  "all persons may freely speak . . . on all subjects being responsible for the abuse of such right.").  The majority of states with almost identical language have interpreted their state constitutional free speech provisions as coextensive with their federal counterparts.[7]  As pointed out by Justice Konenkamp, although we must address questions of constitutional interpretation "autonomously [to] develop a coherent body of South Dakota constitutional law," we do look to other states for guidance.  *Schwartz*, 2004 SD 123, ¶33, 689 NW2d 430, 438 (Konenkamp, J., concurring).

[¶23.]	The only authority Gilbert advances for a broader interpretation of South Dakota's Constitution is California's interpretation of their similarly worded

---

7.	*See*, *e.g.*, Fiesta Mall Venture v. Mecham Recall Committee, 767 P2d 719, 724 (ArizCtApp 1988); Citizens for Ethical Government, Inc. v. Gwinnett Place Assocs., L.P., 392 SE2d 8, 9-10 (Ga 1990); People v. DiGuida, 604 NE2d 336, 344-45 (Ill 1992); State v. Milner, 571 NW2d 7, 12 (Iowa 1997); Woodland v. Michigan Citizen's Lobby, 378 NW2d 337, 346-47 (Mich 1985); State v. Wicklund, 589 NW2d 793, 799-801 (Minn 1999); State v. Felmet, 273 SE2d 708, 712 (NC 1981); Eastwood Mall Inc. v. Slanco, 626 NE2d 59, 61 (Ohio 1994); Charleston Joint Venture v. McPherson, 417 SE2d 544, 548 n7 (SC 1992); Southcenter Joint Venture v. National Democratic Policy Comm., 780 P2d 1282, 1291-92 (Wash 1989); Jacobs v. Major, 407 NW2d 832, 836-37 (Wis 1987).

constitutional provision on free speech.[8]  However, California has made such determinations in the context of compelled speech, obscene speech, and the absence of state action.  *See* Gerawan Farming, Inc. v. Lyons, 12 P3d 720, 735 (Cal 2000) (stating that the California right to free speech, unlike the First Amendment, runs against the world and is unlimited in scope).  In Gilbert's case, there is no question that there is state action because the South Dakota Unemployment Insurance Division denied Gilbert UI benefits.  Furthermore, even if we interpret "public concern" liberally, we could not conclude that her speech was more than the airing of internal grievances.  Interpreting South Dakota's constitution as affording greater protection than the Federal Constitution is a "significant undertaking for any state court."  *Wicklund*, 589 NW2d at 799.  Under the facts of this case, we do not find greater protection in Article VI, Section 5 and decline to extend its protection further than the First Amendment of the United States Constitution.

[¶24.]        Gilbert also argues that the administrative law judge's findings were "clearly erroneous in light of the entire evidence in the record."  However, Gilbert cites to nothing in the record nor any authority to support her argument.  Therefore, we find her argument is without merit.  Chapman v. Chapman, 2006 SD 36, ¶31, 713 NW2d 572, 580.

---

8.    Article I, Section 2 of California's Constitution provides:  "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."

   The California Court of Appeals recently noted that the "state Constitution's free speech clause is at least as broad, and in some ways broader, than the comparable provision of the federal Constitution."  ARP Pharmacy Serv., Inc., v. Gallagher Basset Serv., Inc., 138 CalApp4th 1307, 1314 (CalCtApp 2006).

[¶25.]        Affirmed.

[¶26.]        GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.